Filed 10/10/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANN M. MORRICAL, Individually and as Trustee, etc., | |
| Plaintiff and Respondent, | A137011 |
| v. | |
| JESSE ROGERS et al., | (San Mateo County Super. Ct. No. CIV 513558) |
| Defendants and Appellants. | |

Siblings Michael (Mike) McGraw, John McGraw and Ann Morrical are co-equal shareholders of a group of family corporations.[1] Disputes between the siblings over the management of these corporations led to conflicts and litigation. Mike and John (collectively the Brothers) then entered into a series of transactions with an outside management company and, over the objection of their sister, voted to restructure the corporate boards of directors, granting effective corporate control to the management company. Ann filed suit to challenge the election of new directors pursuant to Corporations Code section 709,[2] arguing that the Brothers had a material financial interest in the transactions between the corporations and management company, and that the transactions were unfair to the family corporations and to her as a minority shareholder. The trial court agreed, setting aside the election of new directors and invalidating several of the underlying corporate transactions.

---

[1] To avoid confusion, and intending no disrespect, reference to individual members of the McGraw family shall be by first name.

[2] All statutory references are to the Corporations Code unless otherwise indicated.

The primary issue presented in this appeal is whether an action brought under section 709, which allows the court to determine the validity of an election of corporate directors, may be based on an alleged breach of fiduciary duty or more specifically a violation of section 310, which governs corporate transactions with companies in which one or more corporate directors have a material financial interest. After reviewing the plain text of the statute, its statutory context, its legislative history, and the case law interpreting the statute, we conclude that section 709 permits a corporate electoral challenge on such grounds.

We also conclude, however, that the trial court erred in failing to require that the Brothers be joined in this action as indispensable parties. We therefore do not address the merits of the judgment entered, but reverse and remand for further proceedings.

## I.     BACKGROUND

From the 1970's to the early 1990's, Jack McGraw, the father of Mike, John and Ann, built the McGraw Group of Affiliated Companies (McGraw Group), companies that originally specialized in the sale of motorcycle and watercraft insurance and later expanded to other lines of insurance. The McGraw Group is comprised of three principal companies: McGraw Company (McGraw), which is the managing agent that sells the insurance and retains a share of premiums; Western Service Contract Corporation (Western), which sells service contracts (essentially extended warranties) to the insureds; and Pacific Specialty Insurance Company (Pacific), the actual insurer and a wholly owned subsidiary of Western. We refer to two entities, McGraw and Western, collectively as the Companies.

Jack and his wife, Joan, eventually transferred ownership in the Companies to their three children, Ann, John and Mike (collectively the Siblings). The Siblings were the sole and equal shareholders of the Companies.[3] Under a "Buy and Sell Agreement," each of the Siblings had a right of first refusal to purchase any other Sibling's Western

---

[3] The Siblings each transferred their shares to revocable trusts, which are now the actual shareholders. Because the Siblings continue to exercise control over the shares as trustees, we refer to the shareholders by the Siblings' names and not by the trusts' names.

2

shares at a discounted price before the shares could be sold to any third party.  Section 7 of the agreement gave Jack and Joan a preemptive right to buy all of the Siblings' Western shares at an even greater discount before the Siblings could sell all of their Western shares to a third party.

The Companies apparently have been successful.[4]  Between 1993 and 2011, each sibling received approximately $53.8 million in dividends and distributions from the Companies and, since about 2005, each sibling's monthly distribution has been approximately $385,000.  Nevertheless, the Siblings have been in conflict for many years over management of the Companies.

A.    *2009 Removal of Mike as Chief Executive Officer and Adoption of Phantom Stock Plans*

In the mid-1990's, Mike took over as chief executive officer of the Companies.  In about 2005, Mike moved to Southern California and became less involved in daily operations, which were left to the Companies' long-term management team:  Tim Summers, Brian McSweeney, David Sacks, and six others.  Sacks (then chief financial officer) resigned in 2009, complaining that Mike was misusing corporate funds for personal expenses.  At the request of Ann and John, an audit was conducted, which in Ann's view showed there was substantial abuse of corporate funds by Mike for personal use.  Jack and Joan attempted to negotiate a resolution of the Siblings' dispute and threatened to assign or sell their preemptive rights under section 7 of the Buy and Sell Agreement in order to pressure the Siblings to come to an agreement.

In November 2009, Ann and John voted to remove Mike as president and chief executive officer of the Companies, and to remove Jack and two other directors from the Pacific board.  Subsequently, McSweeney was appointed president of McGraw and Western, Summers was appointed president of Pacific, and Sacks was rehired as vice president of corporate risk and finance.

---

[4] The parties presented conflicting testimony at the evidentiary hearing in this matter as to whether the Siblings' disputes had harmed the Companies' performance and whether the Companies were as successful and well managed as they should have been.

3

In February 2010, McGraw adopted phantom stock plans (PSP's) for nine of the Companies' managers (including McSweeney, Summers and Sacks),[5] which gave the managers immediately-vesting equity interests in the Companies payable upon a change in control, and which were designed as a retention and incentive tool. In the meantime, Jack and Joan sold Mike their preemptive rights under section 7 of the Buy and Sell Agreement for $400,000 (Section 7 Assignment). Litigation ensued.[6]

B.      *The Altamont Transactions*

Defendant Altamont Capital Management, LLP (Altamont Management) is affiliated with Altamont Capital Partners, which is represented to be a private equity firm with $500 million in capital that focuses on investing in middle-market businesses that have not reached their full potential. Defendants Jesse Rogers and Keoni Schwartz were cofounders and managing directors of Altamont Capital Partners, and defendant Gene Becker was an operating partner. Rogers had personal connections with Mike. Becker had personal connections to Mike and Jack, and had served as a Pacific director until he was removed along with Jack in November 2009.

In August 2011, Altamont Management proposed an investment relationship with the Companies that would involve the purchase of one or more of the Siblings' shares in the Companies. At about the same time, Altamont Capital Partners proposed a purchase of Mike's shares with investment funds it managed. In December, the Brothers discussed a sale of Mike's shares in the Companies to John that would be financed by Mike and an

---

[5] The PSP's consisted of "Phantom Stock Plans" and "Participation Agreements" that benefitted McSweeney and Summers and "Management Phantom Stock Plans" that provided smaller benefits to seven other managers, including Sacks.

[6] In March 2010, Mike (individually and derivatively on behalf of the Companies) sued Ann and John for breach of fiduciary duty, conspiracy, and waste of corporate assets due to the adoption of the PSP's. (*McGraw v. McGraw* (Super. Ct. San Mateo County, 2010, No. CIV-492464); hereafter PSP Action.) He later added McSweeney and Summers as additional defendants. John and Ann cross-complained, alleging the Section 7 Assignment was void and amounted to a forfeiture of Mike's, Jack's and Joan's rights under section 7 of the Buy and Sell Agreement. In November 2010, Western sued Mike for breach of fiduciary duty in purchasing the section 7 rights from the Jack and Joan, alleging he had misappropriated a corporate opportunity.

4

Altamont entity, with that entity receiving an interest in the appreciation of certain stock. All of these deals fell through.

On February 28, 2012, the Brothers noticed a joint special board meeting for McGraw and Western to consider amendments to the Companies' articles of incorporation and bylaws, adoption of management and director indemnification agreements, appointment of officers, and (as to Western only) purchase of Mike's Section 7 Assignment rights. John sent Ann copies of the proposed board actions, as well as copies of agreements between the Brothers and affiliated Altamont entities (collectively the Altamount Transactions). The Altamont Transactions, consist more specifically of the following:

1. *Expansion of the Companies' Boards*

    a. *Amendments to Bylaws and Articles of Incorporation*

The Brothers agreed to amend the bylaws and articles of incorporation of the Companies to increase the size of each board to eight directors and to adopt certain "shareholder protections." The protections required approval by holders of a majority of a Companies' stock before the Companies or its subsidiary could take certain actions, such as issuing new stock, incurring indebtedness greater than $25 million, or authorizing a merger or a sale of 40 percent or more of company assets outside of the McGraw Group.

    b. *Voting Agreement*

Under a voting agreement, the Brothers agreed to vote their shares "to ensure that Altamont [Management] shall be entitled to designate five candidates to be elected as members of the Board of Directors of [the Companies]" and to maintain the size of each board at eight directors.

    c. *Indemnification Agreements*

Indemnification agreements would be adopted for all directors.

2. *Management Agreement*

Under a management agreement, Altamont Management would provide McGraw, Western, and Pacific with management, consulting, financial and other advisory services

for a fee of $500,000 a year. Altamont Management promised to "devote such time and efforts to the performance of services contemplated hereby as [Altamont Management] deems necessary or appropriate." The agreement allowed Altamont Management and its affiliates to directly or indirectly engage in competing businesses and to withhold potential business opportunities from the McGraw Group and pursue those opportunities for its own or for other companies' benefit.

3.      *Payments to and by the Brothers*

a.      *Loans by Altamont California*

Altamont California Investment LLC (Altamont California) would loan $4 million and $2 million to Mike and John respectively. The Brothers would sign nonrecourse promissory notes promising to repay these amounts with interest by March 13, 2019, and would pledge McGraw stock as collateral for the notes.

b.      *Cash Settled Stock Option Agreements* (*CSSOA's*)

Mike and John would give Altamont California cash-settled stock option rights in exchange for payments of almost $2 million and $1 million respectively. Under these agreements, Altamont California would recover a percentage of the difference between the fair market value and the stated "exercise price" for certain shares of Western and McGraw owned by the Brothers. The exercise price was based on a valuation in excess of $300 million for the companies. The option rights could be exercised at the end of a seven-year term, which was extendable by up to three years at the Brothers' option.

c.      *Expense Agreement*

Mike and John would pay Altamont California $1,805,000 and $645,000 respectively and amounts "equal to the fees and expenses reasonably incurred by [Altamont California] with respect to the [Promissory] Note[s]" (Expense Agreement).

d.      *Purchase of Section 7 Assignment*

Mike would offer to sell Western the Section 7 Assignment for $500,000 to be paid to a charitable foundation designated by Jack and Joan.

C.      *March 12, 2012 Joint Board Meeting and Election of Altamont Directors*

On March 12, 2012,[7] after the trial court denied Ann's request to enjoin the board from adopting the Altamont Transactions, the joint board meeting took place.  The boards adopted the management and indemnification agreements and amendments to the Companies' articles of incorporation and bylaws that expanded the size of the boards.[8]  The Western board agreed to purchase Mike's Section 7 Assignment.  The boards then elected five Altamont Management designees as directors of each company:  Rogers, Schwartz, Becker, John Chu, and Brian Cohen (collectively the Altamont Directors).

D.      *Post-Election Actions by Altamont Directors*

1.      *Appointment of Chu as Chairman of the Boards*

At a March 15, 2012 joint board meeting, the eight-member boards appointed Chu as chairman of each board (replacing John at Western and Ann at McGraw).  Chu earned $200,000 a year for serving in this position, plus an annual bonus of $100,000 that was guaranteed the first year and awarded at the boards' discretion thereafter.  Cohen signed Chu's contract.

---

[7] Also on March 12, 2012, the trial court (Hon. Robert D. Foiles) considered the Brothers' proposal for a settlement of the PSP Action and Western's suit regarding the Section 7 Assignment.  Ann opposed the settlement on the ground that it was improperly induced by the Altamont Transactions, which the Brothers had not presented to the court.  She argued the Altamont Transactions violated the Buy and Sell Agreement and were unfair to the Companies.  The court declined to approve the settlement.  "[I]t does not appear to be in the best interest of the company and the shareholders and is contrary to the Buy-Sell Agreement."  Mike challenged the ruling by writ petition, which was denied by Division One of this court on March 27 (*McGraw v. Superior Court* (Mar. 27, 2012, A134949)).

In the meantime, Ann sued Mike, Altamont Capital Partners, and Altamont Management for breach of contract, breach of fiduciary duty, and interference with contract relations based in part on allegations that the Altamont Transactions violated the Buy and Sell Agreement and Mike's fiduciary duties (*Morrical v. McGraw* (Super. Ct. San Mateo County, 2012, No. CIV 512421); hereafter the Altamont Contract and Tort Action)).

[8] Ann originally voted no, but then changed her vote to an abstention.

### 2. *Creation of the Executive Committee*

At the same meeting, the directors created an executive committee of each board to deal with issues delegated to them by the full boards. Chu, Becker and Schwartz were appointed to these committees, which apparently functioned as a single body (hereafter the Executive Committee).[9] The boards then authorized the Executive Committee to do the following: consider updates to the Companies' bylaws; consider the sufficiency of controls over key company functions including cash handling, accounts payable, and regulatory communication; take any action with respect to the PSP Action deemed necessary and in the best interest of the Companies; review the performance of managers who were beneficiaries of the PSP's and then take any action necessary, including changing personnel; and consider the composition of the Pacific board and take actions consistent with its findings.

### 3. *Reimbursement of Mike's Legal Fees in PSP Action Since March 1, 2012*

In April 2012, the Executive Committee decided to reimburse Mike for the legal fees he had incurred in the PSP Action since March 1, which covered the period after Mike said he wanted to dismiss the case. At the time of trial in the instant matter, no reimbursement had been made.

### 4. *Termination of McSweeney and Sacks; Hiring of Cohen*

In May 2012, the Executive Committee removed McSweeney from his officer positions at McGraw and Western and terminated Sacks. McSweeney reached a settlement with the Companies regarding his rights under the PSP's, which apparently were terminated by the Executive Committee. At the time of trial, Cohen was also trying to negotiate a new contract with Summers that would replace the PSP's with a new management incentive plan.

Cohen was made chief executive officer of McGraw, Western and Pacific. In Ann's view, Cohen took over McSweeney's position. Cohen's base salary was set as the

---

[9] These three directors were also appointed to the "Administrative Committee" of the PSP's to establish clear procedures relating to the plans.

same level as Summers's salary ($550,000 a year), but his potential bonuses were greater and were guaranteed for the first year. Cohen also participated in a "Senior Management Incentive Program" that gave him a four percent interest in the McGraw Group if it was sold for more than $300 million. Chu signed Cohen's contract.

5.      *Changes in Pacific Board of Directors*

In May 2012, the Western board removed McSweeney and Summers as directors of Pacific and elected the Altamont Directors to the Pacific board.

6.      *Retention of Mayer Brown*

According to Ann, the Executive Committee retained the Mayer Brown law firm and its partner, James Woods (a friend of Mike and Jack), to represent the Companies at a cost of $1 million.

E.      *Section 709 Action*

On May 2, 2012, Ann (both individually as a shareholder and derivatively on behalf of McGraw and Western) sued Altamont Management and the Altamont Directors (collectively Altamont) pursuant to section 709 (Section 709 Action).[10] She asked the court to invalidate the March 12, 2012 election and for related relief, including setting aside all acts taken by the Altamont Directors. She argued the Brothers were disqualified from voting in the election because they had material financial interests—due to the loans and CSSOA's—in the decisions to expand the boards, elect the Altamont Directors, and adopt the management agreement with Altamont Management, all of which she claimed were unfair to the Companies. Ann specifically alleged that the election was invalid under section 310.

Altamont moved for judgment on the pleadings and argued, inter alia, for dismissal of the action because the Brothers had not been joined. The trial court (Hon. Barbara J. Mallach) denied the motion.[11] Trial took place on seven days between June 27 and July 19, 2012. At the conclusion of trial, the court granted the parties' request for a

---

[10] On May 7, 2012, Ann dismissed the Altamont Contract and Tort Action.

[11] The court also denied Altamont's motion for judgment at the close of Ann's case-in-chief.

9

delay in its ruling so that settlement efforts could continue.  On October 4, 2012, with a settlement still not achieved, the court issued an oral ruling from the bench:  "The plaintiff has the burden of proving the election of the challenged board of directors was invalid . . . .  [T]he [plaintiff's] position is that the voting board of directors had an interest due to financial dealings; or in essence, were not uninterested. [¶] And the plaintiff's position is that then the burden shifts to the defense to show . . . that the actions were just and reasonable to the company. . . . [¶] . . . [T]he Court has found that the plaintiff has met [her] burden . . . . [¶] . . . [T]he defendant[s] did not meet their . . . burden in [showing] that the actions were just and reasonable to the company. [¶] So therefore, . . . the Court is ruling in favor of plaintiff invalidating the election . . . and invalidating the transfer of managerial control."

The court did not issue a statement of decision, noting that the parties had agreed on the record that one would not be required.[12]  The written judgment declared the March 12, 2012 election of the Altamont Directors invalid; prohibited those persons from acting as directors for McGraw and Western, members of the Executive Committee, or managers of the companies; and set aside "all acts purportedly taken by [the defendants] ostensibly on behalf of the Companies to facilitate, implement or effectuate the Invalid Election . . . .  In particular, the following actions purportedly taken in connection with, or as a result of, the Invalid Election are adjudicated to be invalid and unenforceable:" expansion of the boards; appointment of the Altamont Directors as directors of McGraw, Western and Pacific; adoption of the management and indemnification agreements; removal of Ann as chairman of the McGraw board; appointment of Chu as chairman of the McGraw, Western and Pacific boards; formation of, and election of three Altamont Directors to, the Executive Committee; delegations of authority to the Executive Committee; the engagement of Mayer Brown, and the employment of Chu and Cohen.

---

[12] The court questioned whether a statement of decision was required in a proceeding of this nature.  Ann's counsel expressly agreed that no statement of decision would be required.  It is not clear that Altamont did so.

10

The court did not set aside the loans or pledge agreements, the CSSOA's, or the voting agreement.

On November 8, 2012, we granted Altamont's petition for a writ of supersedeas and stayed enforcement of the trial court's judgment pending resolution of this appeal (*Rogers v. Superior Court* (Nov. 8, 2012, A137001) [nonpub. order]).

## II. DISCUSSION

### A. *Available Grounds for a Section 709 Action*

The primary issue on appeal is whether the conflict of interest and breach of fiduciary duties raised by Ann as the grounds for her challenge to the election are proper grounds for a section 709 action. Altamont argues the Legislature never intended that issues as complex as breach of fiduciary duty would be adjudicated in a summary section 709 proceeding and that doing so is a violation of due process rights. It argues the statute was intended to adjudicate only electoral process issues such as the adequacy of notice and the presence of a quorum at a board election, disputes over persons' rights to vote, and the validity of voting agreements.[13] Based on our review of the statutory language, the legislative history of section 709, case law applying the statute and its predecessors, and due process considerations, we reject Altamont's position. We conclude that a trial court may properly consider breach of fiduciary duty and conflict of interest allegations in determining a corporate electoral challenge brought under section 709.

The interpretation of a statute and the resolution of a constitutional due process issue are question of law, which this court examines independently. We are not bound by the trial court's construction. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 768.) Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.) Intent is determined foremost by the plain meaning of the statute's language. If the language is clear and unambiguous,

---

[13] Altamont repeatedly raised this argument in the trial court.

there is no need for judicial construction. When the language is reasonably susceptible of more than one meaning, it is proper to examine a variety of extrinsic aids in an effort to discern the intended meaning. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775–776; *State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 53.) We may consider constitutional concerns the case presents, the statutory scheme, the apparent purposes underlying the statute, and the presence (or absence) of instructive legislative history. (See *Hughes v. Board of Architectural Examiners,* at p. 776; *State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.,* at p. 53.)

Section 709 provides: "(a) Upon the filing of an action therefor by any shareholder or by any person who claims to have been denied the right to vote, the superior court of the proper county shall try and determine the validity of any election or appointment of any director of any domestic corporation . . . .

"(b) Upon the filing of the complaint, and before any further proceedings are had, the court shall enter an order fixing a date for the hearing, which shall be within five days unless for good cause shown a later date is fixed, and requiring notice of the date for the hearing and a copy of the complaint to be served upon the corporation and upon the person whose purported election or appointment is questioned and upon any person (other than the plaintiff) whom the plaintiff alleges to have been elected or appointed . . . .

"(c) The court may determine the person entitled to the office of director or may order a new election to be held or appointment to be made, may determine the validity, effectiveness and construction of voting agreements and voting trusts, the validity of the issuance of shares and the right of persons to vote and may direct such other relief as may be just and proper."

It is well established that section 709 and its predecessor statutes afford an equitable cause of action. (*Braude v. Havenner* (1974) 38 Cal.App.3d 526, 530 (*Braude*) [discussing former § 2283].)

12

1. *Plain Language of the Statute*

Contrary to Altamont's arguments, nothing in the plain language of section 709 restricts the grounds on which the validity of an election or appointment of directors can be challenged.

Section 709, subdivision (a), provides without limitation that the court "shall try and determine the validity of any election or appointment of any director of any domestic corporation." Altamont notes that the subdivision authorizes only a shareholder or "any person who claims to have been denied the right to vote" to initiate an action under the statute. It argues that this language implies the action is limited to voting and similar electoral process issues. However, the plain language restricts only *standing* to bring an action and says nothing about the *grounds* on which persons with standing may challenge the validity of an election.

Altamont argues the summary procedures set forth in subdivision (b) imply that the grounds for a section 709 proceeding must be restricted to technical or procedural issues. This is not a plain language argument, but one which we address *post*.

Section 709, subdivision (c), also does not restrict the grounds on which the validity of an election may be challenged. A close reading of the subdivision demonstrates that it addresses the "relief" a court may direct in a section 709 proceeding, not the grounds on which the validity of an election or appointment may be challenged. The subdivision includes a nonexhaustive list of appropriate forms of relief and a savings clause that provides the court "may direct such other relief as may be just and proper." In any event, as discussed *post*, the legislative history of section 709 indicates that subdivision (c) is not a restriction on the court's powers under the statute.

2. *Context of Statutory Scheme*

Altamont argues that the placement of section 709 in chapter 7 of title 1, division 1, of the Corporations Code, which is entitled "Voting of Shares," indicates that section 709 was intended to remedy abridgements of the voting rights addressed in that

13

chapter.[14]  Indeed, Altamont argues "[t]he surrounding statutes in chapter 7 *define* the nature of the voting rights that may be adjudicated under section 709" (italics added), and notes, "[n]one of the surrounding statutes contemplate invalidating an election based on a breach of fiduciary duties."  We reject the proposition that section 709 is strictly limited to violations of rights otherwise protected in chapter 7.  As the central function of section 709 is to determine the validity or invalidity of an election or appointment of a corporate director, we see no anomaly in its placement in a chapter on shareholder voting, regardless of whether the statute is construed narrowly as urged by Altamont or broadly as urged by Ann.

      3.     *Legislative History*

Altamont argues that the legislative history of section 709 and its predecessor statutes demonstrates that the Legislature intended proceedings under the statutes to be limited to procedural and technical challenges to the electoral process.[15]  We are not persuaded.

Altamont argues the legislative history "shows that lawmakers, over the decades, increasingly tightened the language and scope of the statute to focus on the corporate electoral process."  It first notes that the earliest version of the statute allowed plaintiffs to challenge not only elections and appointments of directors, but also any "proceeding, act, or matter in or touching the same," whereas the current statute only permits challenges to

---

[14] Altamont cites a report of a State Bar committee that allegedly demonstrates the drafters of a 1931 predecessor statute to section 709 intended to arrange "the code sections on corporations is a logical order, grouping together related matters."  (Rep. of State Bar Com. on Revision of the Corporation Law (1930) 5 State Bar J., p. 38.)  Although Ann challenges the reliability of the cited report, we would presume even in the absence of any legislative history on point that the Legislature attempts to organize statutory schemes in a logical manner.  As a general rule, we construe statutes in context, taking into consideration chapter and division headings.  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387; *People v. Hull* (1991) 1 Cal.4th 266, 272.)

[15] We grant the parties' three requests, filed on February 27, March 28, and April 17, 2013, that we take judicial notice of legislative history of section 709 and its predecessor statutes.  (Evid. Code, §§ 452, 459; Cal. Rules of Court, rule 8.252(a).)

elections and appointments of directors.  (Compare Civ. Code, former § 315 [Stats. 1850–53, ch. 128, § 15, p. 283 (authorizing action when any aggrieved person "complain[ed] of any election held by any corporate body, or any proceeding, act, or matter in or touching the same") & Stats. 1931, ch. 862, § 2, pp. 1763, 1779 (authorizing action to challenge "the election or appointment of a director at a meeting of shareholders or directors")] with § 709, subd. (a) [authorizing action to "determine the validity of any election or appointment of any director of any . . . corporation"].)  While these changes demonstrate an intent to limit the *target* of section 709 actions to elections and appointments of directors, they do not demonstrate any intent to limit the *grounds* on which such elections or appointments can be challenged as invalid.  Because Ann's action is directed at an allegedly invalid election of directors, which is appropriate under the former and current versions of the statute, these changes also are not directly relevant to this action.

Altamont observes that early versions of the statute allowed any aggrieved person to bring an action, whereas the current statute only allows shareholders and those claiming they were denied their right to vote to bring an action.  (Compare Civ. Code, former § 315 [Stats. 1850–53, ch. 128, § 15, p. 283 (any aggrieved person) & Stats. 1931, ch. 862, § 2, pp. 1763, 1779 (shareholder)] with § 709, subd. (a) [shareholder or person claiming denial of right to vote].)  Again, these changes limit *standing* to bring a section 709 action but do not limit the *grounds* on which an election can be challenged. And again, because Ann is a shareholder, these changes are not directly relevant to this action.

Finally, Altamont argues that the references to specific remedies in subdivision (c) of the current statute (authorizing the court to "determine the validity, effectiveness and construction of voting agreements and voting trusts, the validity of the issuance of shares and the right of persons to vote"), which were added by the most recent amendment in 1975, imply an intent to limit the grounds for section 709 actions to problems with the electoral process.  (See Stats. 1975, ch. 682, § 7.)  However, a treatise that Altamont itself produced to explain the meaning of the 1975 amendment states that the text of

15

subdivision (c) was added "[i]n order to make completely clear that [prior cases interpreting section 709] continue to be valid authority under the new statute." (1 Marsh, Cal. Corp. Law and Practice (1977 West's Cal. Practice Series) § 11.3, p. 16 (Marsh).) The treatise described those prior cases as follows: "The cases have uniformly held that this proceeding is equitable in nature and that the court in such proceeding will consider all matters necessary to a determination of the validity of the contested election." (*Id.* at p. 13; see also *id.* at p. 14 & fn. 27, citing *Lawrence v. I. N. Parlier Estate Co.* (1940) 15 Cal.2d 220 (*Lawrence*).) For example, "In *Boericke v. Weise* [(1945) 68 Cal.App.2d 407 (*Boericke*)] the court held that in such a proceeding the court could inquire into the validity of a voting trust agreement, although collateral questions as to whether there had been a breach of the voting trust agreement should not be injected into the case. . . . '[M]atters which relate solely and exclusively to the rights of the stockholders between themselves, or between themselves and third persons, are not involved.' " (Marsh, at p. 15 & fn. 33.) Further confirming that the added text to subdivision (c) was not meant to be a limitation on the court's remedial powers, the treatise states, "In a proceeding under Section 709, the court is authorized to . . . order any form of relief which may be appropriate to do complete justice as between the parties." (Marsh, at p. 16.)

We are more persuaded by the following *consistent* features of the statute throughout its legislative history: (1) the court is empowered to determine the validity of a corporate election with no express restriction on the grounds on which the validity could be challenged; (2) the determination must be made promptly and in a summary procedure; and (3) the court's remedial powers are equitable and broad. (See Civ. Code, former § 315 [Stats. 1850–53, ch. 128, § 15, p. 283; Stats. 1877–1878, ch. 639, § 1, p. 79; Stats. 1901, ch. 157, § 74, p. 348; Stats. 1905, ch. 416, § 9, p. 560; Stats. 1931, ch. 862, § 2, pp. 1763, 1779; Stats. 1933, ch. 533, § 23, p. 1371]; Corp. Code, former §§ 2236–2238 [Stats. 1947, ch. 1038, pp. 2347–2348]; Corp. Code, § 709 [Stats. 1975, ch. 682, § 7, pp. 1516–1570].) In our view, nothing in the legislative history implies a restriction on the grounds available for invalidating an election under the statute.

4.      *Case Law*

Altamont implies that the case law addressing section 709 and its predecessor statutes confirms that the statute was always intended to apply only to errors in the electoral process. It writes, "[D]espite case law stretching back over a century, no case has ever invalidated an election under section 709 for breach of fiduciary duty or a conflict of interest." (Italics omitted.) Courts have repeatedly held, however, that an election may be challenged on any ground in a section 709 or predecessor action, and issues comparable to breach of fiduciary duty have been decided in section 709 or predecessor actions.

Another division of this court directly addressed the question of what issues may appropriately be raised in a section 709 summary proceeding in *Columbia Engineering Co. v. Joiner* (1965) 231 Cal.App.2d 837 (*Columbia*). Based on its review of the case law under the predecessor statutes of section 709, the court concluded: "[A]lthough summary in nature, the actions provided for by [section 709 predecessor statutes] were not intended . . . merely to determine the technical and procedural questions involved in a corporation election." (*Columbia,* at p. 844.) Rather, they provide "for a proceeding in equity to determine *all questions which may affect the validity of a contested election.*" (*Id.* at p. 849, italics added.) The only restriction is that the court will not decide issues unrelated to the validity of the election: "Matters of corporate behavior, dealing with corporate management, general accounting, etc., cannot be considered *unless they affect the validity of the election.*" (*Ibid.,* italics added; see also *Braude, supra,* 38 Cal.App.3d at p. 530.) We agree with the *Columbia* court's analysis.

In *Boericke*, the court held that a trial court may determine the validity of a voting trust agreement insofar as it affects an election, but may not decide "matters which relate solely and exclusively to the rights of the stockholders between themselves, or between themselves and third persons." (*Boericke, supra,* 68 Cal.App.2d at pp. 418–420.) *Boericke* also held that the equitable defenses of estoppel and unclean hands could properly be raised in the section 709 predecessor action because the statute was remedial and "obviously was intended to confer upon the superior court the power to determine in

17

a summary proceeding whether or not a particular director or the entire board was or was not properly elected or appointed in order that the corporation can properly function." (*Boericke,* at p. 411; see also *Goss v. Edwards* (1977) 68 Cal.App.3d 264, 271 [court may decide issues of laches and estoppel; "[a]n action to defeat a corporate election is a broad-based equity action in which the court may examine the entire transaction without being limited to technical or procedural issues"].) Finally, the Supreme Court held in *Lawrence* that an action under a section 709 predecessor statute "is in the nature of an equitable proceeding in which *the court will consider all matters necessary to a proper determination of the validity of the contested election . . . .*" (*Lawrence, supra,* 15 Cal.2d at p. 227, italics added.)

Altamont argues these cases all addressed alleged irregularities or improprieties in the election process, whereas this case does not. We disagree. The crux of Ann's challenge to the election of the Altamont Directors is that the Brothers' exercise of their votes pursuant to the voting agreement was tainted by breach of fiduciary duty and conflict of interest. The evidence proffered to prove that taint—the loans, the CSSOA's, and the management agreement (which had been drafted before the vote)—were no farther afield from the election controversy than the circumstances surrounding the execution of a voting agreement in *Boericke, supra,* 68 Cal.App.2d at pages 420–421; the alleged manipulation of stock records in *Lawrence, supra,* 15 Cal.2d at pages 222–224, 228–231; or the history of financial transactions reviewed in *Columbia, supra,* 231 Cal.App.2d at pages 840, 849–858, to determine whether certain stock had been validly issued.[16]

---

[16] See also *Wisler v. Wisler* (1961) 198 Cal.App.2d 511, 512–514 (considering circumstances surrounding issuance of shares); *Michaels v. Pacific Soft Water Laundry* (1930) 104 Cal.App. 366, 367–368 (considering whether bank accepted stock as collateral for a loan in good faith and in the ordinary course of its business and thus had the right to vote the shares); *Peterson v. Taggart* (1934) 1 Cal.App.2d 468, 469 (considering whether a city could legally own the stock it voted in a corporate election); *Goss v. Edwards, supra,* 68 Cal.App.3d at pp. 269–271 (considering whether Corp. Code statute requiring voting agreements to be revocable at will conflicted with other statutory

Moreover, courts in exercising their equitable powers in section 709 or predecessor statute actions have decided similar issues. *Lawrence* involved issues of fraud and breach of fiduciary duty. (*Lawrence, supra,* 15 Cal.2d at pp. 226, 230.) In upholding a trial court order setting aside an election, the court held that a defendant "should not have so manipulated said stock certificates as to gain any personal advantage to himself to the detriment of either the corporation or its stockholders or the owners of said stock," citing a director's fiduciary duties. (*Id.* at p. 230.)

In *Smith v. California Thorn Cordage, Inc.* (1933) 129 Cal.App. 93, 98 (*Smith*), the court determined the legality of an underlying contract in order to resolve a section 709 predecessor action. (See *Lawrence, supra,* 15 Cal.2d at p. 227 [citing *Smith* in support of statement that, in Civ. Code, former § 315 action, "the court will consider all matters necessary to a proper determination of the validity of the contested election"].) The court held, "A casual reading of the contract at once discloses that it is a bald attempt to usurp the powers and duties of the directors. . . . Such contracts are clearly illegal and unenforceable in law and in equity." (*Smith,* at pp. 98–99.)

In *Kauffman v. Meyberg* (1943) 59 Cal.App.2d 730, 733–734, the court looked behind an ostensible irregularity in the issuance of a stock certificate to one of two siblings who inherited a corporation from their father and, applying principles of fairness and equity, upheld the trial court's ruling that the certificate was valid. The court noted that friction between the siblings had apparently led the defendants to assert a technical flaw in the stock certificate as a "bold and piratical pretense to remove [the plaintiff] from the presidency." (*Id.* at p. 737.) The court held, "Equity looks through form to substance and on beholding the substance will require the corporation to reform its transactions to meet the ends of justice." (*Id.* at p. 739.)

In *Braude, supra,* 38 Cal.App.3d at page 529, another division of this court ruled an election invalid under former section 2236 because the manner in which management

provisions and policies that allowed one spouse to have sole power to manage community property company).

19

solicited vote proxies and ran the nominating process were improper.  "Incumbent directors may not use the corporate proxy machinery solely to perpetuate themselves in office.  [Citations.]  . . . [L]imits on the board's use of the corporate proxy machinery are inherent in each director's fiduciary obligations to the members or shareholders. [Citation.]"  (*Braude,* at p. 532.)

Insofar as breach of fiduciary duty claims affect the validity of an election, they are within the scope of the trial court's authority in deciding a section 709 action.[17]

5.    *Due Process Concerns and Summary Proceedings*

As explained in *Boericke*, section 709 (and its predecessors) "obviously was intended to confer upon the superior court the power to determine in a summary proceeding whether or not a particular director or the entire board was or was not properly elected or appointed in order that the corporation can properly function." (*Boericke, supra,* 68 Cal.App.2d at p. 411.)  Altamont argues section 709 should be construed narrowly to exclude election challenges based on alleged breaches of fiduciary duty or conflicts of interest because adjudication of such issues in a summary proceeding may violate a defendant's procedural due process rights.  We are not convinced that the narrow construction of section 709 urged by Altamont is necessary to avoid unconstitutionality under the due process clause.

Altamont cites *Wulfjen v. Dolton* (1944) 24 Cal.2d 878 (*Wulfjen*) for the proposition that summary procedures might deprive a defendant of his or her right to due process of law.  *Wulfjen* raised due process concerns about the use of money judgment enforcement procedures to order third parties to surrender their property despite their

---

[17] Altamont cites *Clopton v. Chandler* (1915) 27 Cal.App. 595 for the proposition that motive in procuring votes in a corporate election is immaterial, implying that issues of bad faith or breach of fiduciary duty are irrelevant in a section 709 action.  In that case, however, the officers were not charged with procuring votes in breach of fiduciary duty, but merely in self-interest, i.e., to retain their positions in the corporation.  The court simply observed, "It is not the motive which prompts the act, but the legality of the act itself[,] with which the law is concerned.  [Citation.]"  (*Clopton v. Chandler,* at p. 601.) An election brought about by acts that breached a director's fiduciary duty are not merely self-interested but also illegal.

claims of superior ownership rights. (*Id.* at p. 890; see *Blake v. Blake* (1927) 86 Cal.App. 377, 380–381 (*Blake*), citing Code Civ. Proc., former §§ 717–720 [Stats. 1933, ch. 744, §§ 143–146, pp. 1891–1892].) Altamont makes no effort to show that a summary proceeding under section 709 is comparable to the summary proceeding authorized by these statutes. It is not. The money judgment enforcement procedures permit only examinations and orders restraining or ordering transfers of the property. (Code Civ. Proc., former §§ 717–720; see also Code Civ. Proc., §§ 708.120, 708.130, 708.170, 708.180, 708.205, 708.210, 708.240.) In contrast, section 709 contemplates an equitable proceeding with availability of a full evidentiary hearing.

Altamont argues that, in the context of breach of fiduciary duty or conflict of interest claims, a section 709 summary proceeding violates a defendant's due process rights "to locate, subpoena, and present percipient and expert financial witnesses not readily available *upon five days' notice*." (Italics added.) Section 709, subdivision (b) requires the date fixed for "the hearing" to be within five days of the filing of the complaint "before any further proceedings are had" and absent "good cause shown [for] a later date [to be] fixed." However, Altamont does not establish that "the hearing" is necessarily the full trial on the complaint—and it was not in this case. The phrase "before any further proceedings are had" in fact suggests that "the hearing" does not refer to full adjudication of the plaintiff's allegations. Even if "the hearing" referred to the trial, Altamont has not shown that the "good cause" provision in the statute is insufficient to protect a defendant's due process rights in a complicated case that cannot reasonably be tried in the five-day default statutory period—as in this case. The record here shows that the complaint was filed on May 2, 2012; the initial hearing date was set for June 25, 2012; and the actual trial took place over 7 days in June and July, concluding on July 19, 2012.

Altamont further argues the summary nature of the section 709 proceeding implies a restriction on discovery that is incompatible with adjudication of issues like breach of fiduciary duty and conflict of interest and that threatens defendants' due process rights in those factual contexts. According to Altamont, questions about election notice, a board

21

quorum, electoral process, stock ownership, and the validity of voting agreements are distinguishable (and thus do not raise due process concerns about summary section 709 proceedings) because they do not require development of a factual record or expert opinions. However, the case law belies this contention. Many of the cases cited by Altamont as appropriately decided under section 709 or its predecessor statutes involved complex factual records regarding corporate formation and the issuance of stock (see, e.g., *Columbia, supra,* 231 Cal.App.2d at pp. 840–841, 849–853 [whether corporation received consideration for issued shares]), interactions and conflicts among the parties prior to the contested election (see, e.g., *Boericke, supra,* 68 Cal.App.2d at pp. 409–417 [describing disputes over adequacy of management of family corporation by second generation heirs]), and agreements extraneous to but arguably affecting the contested election (see, e.g., *Colburn Biological Institute v. DeBolt* (1936) 6 Cal.2d 631, 635–636, 638–639 [effect of settlement agreement on election]).

Altamont argues more specifically that it was wrongfully denied discovery in this action: "[T]he trial court . . . overrul[ed] Defendants' request for even limited discovery. [Citation.] Thus, Defendants had no opportunity to request documents or propound interrogatories to explore Plaintiff's legal and factual theories. There were no depositions of experts.[18] . . . Plaintiff also introduced volumes of exhibits stretching back over a decade, which Defendants, as newcomers to the family drama, were in no position to rebut." Altamont, however, does not cite evidence in the record that it ever requested additional time for discovery before trial; it simply cites a statement by counsel on the first day of trial that no discovery had been conducted. Altamont's protest that, as a stranger to the McGraw family drama, it was unable to prepare adequately for trial with limited time is also unpersuasive in light of the record. In sum, Altamont cites no specific prejudice it faced at trial due to the alleged denial of discovery and our extensive

---

[18] Altamont also claims that it never received a report by Ann's expert, but it fails to mention, that when Altamont raised this complaint before trial commenced, Ann's counsel agreed to provide a report consistent with Code of Civil Procedure section 2034.270 requirements and the court ordered him to do so.

22

review of the trial record revealed none. Altamont fails to demonstrate either that the trial court abused its discretion in denying it discovery or that its due process rights were violated.[19]

While rejecting the specific claims advanced by Altamont on the record before us, we do not lightly dismiss the due process concerns Altamont more broadly raises. Nor do we disagree that sometimes complex factual disputes, not readily amendable to summary proceedings, may require resolution when issues such as breach of fiduciary duty underlie the electoral contest. A summary trial of complex issues without the discovery and preparation available in ordinary civil actions may indeed result in a denial of a party's substantive procedural rights and the constitutional right to due process. Trial judges, however, have ample inherent supervisory and administrative power to " ' " 'to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council' " ' " and " 'exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice.' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967.) We are confident that a conscientious trial judge can adequately balance the need for expedition in an equitable proceeding of this nature with the rights of the parties to prepare and present an adequate record, and to have a fair hearing on the merits. Altamont does not demonstrate that the trial court failed to do so here.

6.      *Conclusion*

In sum, we find no basis to infer an unwritten limitation on the scope of an action under section 709 where the Legislature has not expressly provided for such a limitation. We therefore reject Altamont's argument that the breach of fiduciary duty and conflict of interest allegations on which Ann's election contest is based cannot be decided in the context of a section 709 proceeding.

---

[19] Since we conclude that retrial will be required on remand, we express no opinion as to the propriety or necessity of discovery in any further proceedings.

23

B.     *Indispensable Parties*

Altamont argues the judgment must be reversed because the Brothers were indispensable parties who were not joined in the action in violation of Code of Civil Procedure section 389.  Altamont specifically argues the Brothers were indispensable parties under Code of Civil Procedure section 389, subdivisions (a)(2) and (b).  We agree that joinder of the Brothers is required under the circumstances of this case.

Code of Civil Procedure section 389, subdivision (a)(2) provides:  "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action *shall* be joined as a party in the action if . . . he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.  If he has not been so joined, the court *shall* order that he be made a party." (Italics added.)[20]  As amended in 1971, Code of Civil Procedure section 389 " 'limits compulsory joinder to those situation where the absence of a person

---

[20] Code of Civil Procedure section 389, subdivision (b) provides:  "If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include:  (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder."  Here, there was never a contention that Mike and John could not be joined as parties.  Ann concedes in her briefing that the Brothers were amendable to service of process in California.  The history of litigation between the Siblings in the San Mateo County Superior Court, including the PSP Action and the Altamont Contract and Tort Action, further confirms that Ann could have joined the Brothers had she wished to do so.  Code of Civil Procedure section 389, subdivision (b), which lists factors which the court must consider if a party cannot be joined, is therefore not directly applicable.

24

may result in substantial prejudice to that person or to the parties already before the court.' [Citation.]"[21] (*People ex rel. Lungren v. Community Redevelopment Agency* (1997) 56 Cal.App.4th 868, 875 (*Lungren*).)

"Whether a party is necessary and/or indispensable is a matter of trial court discretion in which the court weighs 'factors of practical realities and other considerations.' [Citation.]" (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1529.) We review a trial court's determinations under Code of Civil Procedure section 389 for abuse of discretion. (*Lungren*, *supra*, 56 Cal.App.4th at p. 875.)

As noted *ante*, Altamont sought dismissal of the action because the Brothers had not been joined, albeit without significant discussion or elaboration on the issue until after the court had pronounced its judgment. The court denied the pretrial dismissal request without explanation.

Altamont argues the Section 709 Action would impair or impede the Brothers' ability to protect specific interests: the Brothers' interest in defending their March 2012 votes as directors, which authorized corporate changes that they believed would enhance the value of the companies; Mike's interest in the board's directive that the Executive Committee consider reimbursing certain of his legal fees in the PSP Action; and the Brothers' interest in obtaining the benefits of (or avoiding the obligations of) the voting agreement, the CSSOA's and the Expense Agreement. Altamont also argues that the

---

[21] Altamont argues joinder of the Brothers is necessary because "[i]t has long been established that where '[a] complete determination of the controversy cannot be had without bringing in parties to the contract or transaction who have not been named as parties to the action in the original complaint,' those parties must be brought in. (*Mackenzie v. Hodgkin* (1899) 126 Cal. 591, 595–596.)" However, this standard is no longer good law. "[Code of Civil Procedure s]ection 389 formerly attempted not only to avoid prejudice to the parties or absent person but also to promote the general convenience of the courts by preventing a multiplicity of suits. As revised, Section 389 takes a different approach; it limits compulsory joinder to those situations where the absence of a person may result in substantial prejudice to that person or to the parties already before the court." (Cal. Law Revision Com. com., 14 West's Ann. Code (2004 ed.) foll. § 389, p. 419.)

25

Brothers were necessary parties because Altamont faced "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [the Brothers'] claimed interest." (Code Civ. Proc., § 389, subd. (a)(2)(ii).) Specifically, Altamont argues that "Defendants" could face inconsistent obligations in subsequent litigation over enforcement of the Altamont California loans and CSSOA's in light of the Section 709 Action judgment. We agree.

Ann counters that she sought no relief from her brothers, and since nothing in the court's judgment adjudicated their rights, they were not indispensable parties. But Ann ignores the theory upon which her case was grounded, the factual predicates necessary for the court to render judgment in her favor, and the consequences of the judgment.

Ann challenged the March 12, 2012 election on the ground that it was part of a series of transactions in which the Brothers breached their fiduciary duties as directors and majority shareholders toward the corporation and her, the minority shareholder. Ann's complaint alleged that the Brothers were disqualified from voting because they were "personally and materially financially self-interested in the subject matter of the [decision to expand the board, the election of the Altamont Directors, and the adoption of the management and indemnification agreements], and were thereby conflicted and disqualified with respect to the voting therefor." The self-interest allegedly arose from the provision of $4 million and $2 million loans, and payment under the CSSOA's of almost $2 million and $1 million, to Mike and John respectively. The complaint alleged that these financial benefits were conditioned on the Brothers' agreement to elect the Altamont Directors, adopt the management agreement, and allow Altamont to exercise control over the day-to-day operations of the Companies. Thus, the complaint alleged that the Altamont Transactions—including the amendments to the bylaws and articles of incorporation expanding the boards, the voting agreement, the indemnification and management agreements, the loans, and the CSSOAs—collectively rendered the election invalid. Specifically, Ann argued they rendered the election invalid under section 310.

Further, Ann's opening trial brief provided a "summary of basis for relief" in the action: "this statutory action under . . . section 709 seeks (a) judicial invalidation of the

26

'election' of a control block of Directors designated by a company (Altamont) that paid the aggregate sum of $9,000,000 to two ([Mike] and John) of the three existing Directors who then purported, in their sole votes, to elect the individuals designated by the payor of those sums (Altamont) as the controlling members of the Board, and (b) judicial invalidation of all related activities, including the transfer of managerial control to the payor (Altamont)." Ann also discussed section 310, "which provides the standard for evaluating interested director transactions." Again, this argument identified the critical features of her theory at trial and on appeal: the loans and CSSOA's, which gave the Brothers a material financial interest in the Altamont Transactions; the causally-connected election of the Altamont Directors ("who then purported[] . . . to elect the individuals designated by the payor of those sums"); and the "related" adoption of the management agreement.

It was, therefore, the *Brothers'* alleged self-interest and breach of fiduciary duty to Ann and to the Companies that formed the necessary predicate for Ann's challenge to the election. And the trial court ultimately determined, in invalidating the election, that the Brothers had a disqualifying interest "due to financial dealings." Wholly aside from any reputational interest which the Brothers may have had at stake, the consequence of the court's finding was not only to invalidate the election of the Altamont Directors, but to declare "invalid and unenforceable" the adoption of the management and indemnification agreements. While the court did not directly set aside the loans or pledge agreements, the CSSOA's, or the voting agreement, Ann's own complaint alleged the interrelationship of the Altamont Transactions and that the financial benefits of the loans and the CSSOA's were conditioned on the Brothers' agreement to elect the Altamont Directors, adopt the management agreement, and allow Altamont to exercise control over the day-to-day operations of the Companies. Under Ann's theory of the case, the consideration Altamont received for the financial benefits provided to the Brothers was rendered a nullity, impairing or impeding the Brothers' ability to protect their interests in the remaining Altamont Transactions (and leaving Altamont subject to a substantial risk of incurring inconsistent obligations by reason of the Brothers' claimed interests).

27

"[I]n determining whether an unjoined person is an indispensable party, potential prejudice to that unjoined person is of critical importance." (*Tracy Press, Inc. v. Superior Court* (2008) 164 Cal.App.4th 1290, 1298 [applying Code Civ. Proc., § 389, subd. (b) factors]; see also *Lungren, supra,* 56 Cal.App.4th at p. 880 [holding that analysis of whether a judgment rendered in a party's absence might be prejudicial to the absent party or the appearing defendants is "essentially the same assessment" that must be made under Code Civ. Proc., § 389, subd. (a)].) " ' "A person is an indispensable party if his or her rights must necessarily be affected by the judgment. [Citations.]" [Citation.]' [Citation.]" (*Tracy Press, Inc. v. Superior Court,* at p. 1298.) The Brothers' rights were necessarily affected by the judgment.

Ann insists that the Brothers' interests were aligned with Altamont's interest, and the Brothers were therefore adequately represented in the action and not necessary parties. But "a common litigation objective is not enough to establish adequacy of representation by the named parties." (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 38.) Given the issues framed by the pleadings and in light of the relief sought in Ann's complaint, it was error not to require Ann to join her Brothers as parties, or to suffer dismissal if she failed to do so.

C.    *Other Issues*

Because we find indispensable parties were not joined and reverse on that basis, we need not address the court's rulings on the merits of the controversy and express no opinion on those issues.

## III.    DISPOSITION

The judgment is reversed and the matter is remanded with instructions that the trial court require that plaintiff Ann Morrical name and serve Michael McGraw and John McGraw as parties to this action, or dismiss this action if she fails to do so. Each party shall bear its own costs on appeal.[22]

---

[22] Filed concurrently herewith is an order in No. A137011 dissolving the writ of supersedeas upon issuance of the remittitur in this matter. (Cal. Rules of Court, rule 8.272.)

_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Needham, J.

Superior Court of the County of San Mateo, No. CIV 513558, Barbara J. Mallach, Judge.

Ropes & Gray, Rocky Chiu-Feng Tsai, Michelle L. Visser, Howard S. Glazer, Douglas H. Hallward-Driemeier, Robert G. Jones; Gibson, Dunn & Crutcher, Daniel M. Kolkey, Thad A. Davis, Michael Li-Ming Wong, Enrique A. Monagas, Kyle A. Withers and Jenna Musselman Yott for Defendants and Appellants.

Reed Smith, Paul D. Fogel, Raymond A. Cardozo, Dennis P. Maio; Long & Levit, Joseph P. McMonigle, John B. Sullivan, Glen R. Olson; Cohen & Jacobson, Lawrence A. Jacobson and Sean M. Jacobson for Plaintiff and Respondent.