[No. A066019. First Dist., Div. Five. July 21, 1995.]

SALVATION ARMY et al., Plaintiffs and Appellants, v.
KRISTEN A. WHEATON PRICE, Defendant and Respondent.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, part II of this opinion is not certified for publication.

## Counsel

Pettit & Martin, Sheldon H. Wolfe, Vaughan, Paul & Lyons, Varnum Paul, Hanson, Bridgett, Marcus, Vlahos & Rudy, Kim T. Schoknecht, Robert L. Rusky and Ann K. Ryles for Plaintiffs and Appellants.

Hellman & Ehlenbach and Jeffrey E. Ehlenbach for Defendant and Respondent.

## Opinion

**HANING, J.**—Appellants the Salvation Army, Guide Dogs for the Blind, Inc., and Masonic Homes of California, charitable beneficiaries under a testamentary trust (Trust B) of Corinne W. Reisinger, appeal an order distributing the trust's assets. Respondent Kristen A. Wheaton Price is one of five residuary beneficiaries under Trust B. Appellants contend the court erred in ruling that the interest of the beneficiaries was determinable on the date of ultimate delivery of the trust's assets, rather than the date the trust terminated.

### PROCEDURAL HISTORY AND FACTS

Corinne W. Reisinger (Corinne) executed her last will in February 1966. The will contained specific bequests to particular relatives and friends and provided for the creation of two trusts upon her death: Trust A, a marital deduction trust, and Trust B, a residuary trust, with net income from both trusts to her husband, James C. Reisinger (James), for life. James and Bank of America were cotrustees of both trusts. Corinne's will also provided: "On the death of my husband, the Trustee shall distribute Trust B as follows, but, if the full amount to be distributed to the following-named charities exceeds the amount available for distribution from Trust B, then the amount distributed to each of the following charities shall be proportionate to the amount hereby designated for distribution to the respective charities: [¶] (a) To the Masonic Homes of California, a California corporation, the sum of $40,000.00, to be used for the benefit of the Masonic Homes for Children; [¶] (b) To the Masonic Homes of California, a California Corporation, the sum of $40,000.00 to be used for the benefit of the Masonic Home for [the] Aged; [¶] (c) To Guide Dogs for the Blind, Inc., a California corporation, of San Rafael, California, the sum of $40,000.00; [¶] (d) To The Salvation Army, a California corporation, with principal offices at 60 Haight Street, San Francisco, California, the sum of $40,000.00; [¶] (e) To Marin Hospital District[2], Marin County, California, the sum of $80,000.00; [¶] (f) The residue of Trust B, plus any property of Trust A not effectively appointed by my husband, shall be divided by the Trustee into as many equal shares as there shall be living children of my nephew, IVAN PANGBORN WHEATON, JR., of Long Beach, California, plus the number of children of said IVAN PANGBORN WHEATON, JR., who shall then be deceased but who shall have

---

[2]Marin Hospital District is not a party to this appeal.

left issue then living, and shall distribute one such share to each of said living children, and shall distribute, per stirpes, one such share to the issue then living of each of said deceased children." Corinne's will also gave the trustees power "(a) To continue to hold any property and to operate at the risk of the trust estate any business that the Trustees receive or acquire under the trust as long as the Trustees deem advisable; provided, however, that unproductive or underproductive property shall not be held as an asset of either trust for more than a reasonable time during the lifetime of my husband."

Corinne died on June 27, 1971, survived by James. A judgment of final distribution of her estate was filed May 4, 1973, confirming the creation of Trust A and Trust B. James held a life income interest in Trust B until his death on November 11, 1974. At the time of his death Trust B assets had an approximate fair market value of $179,382.00 and a "carry value" of $242,441.40.

On April 8, 1975, the trustee petitioned the court for instructions. Each trust included a one-twelfth interest in an approximately fifty-acre parcel of unimproved real property in Tiburon, which was the subject of four pending state and federal civil actions involving, inter alia, claims for inverse condemnation, declaratory and injunctive relief and trespass. The corporate trustee had been served as a defendant in all four actions, and James's estate was party to several of the actions. The trustee questioned whether distribution of the trusts' assets should be deferred until termination of the pending actions. The trustee stated: "The several beneficiaries of Trust B, all charities, are not parties to the said actions. It would appear to be in the best interest of Trust B to distribute its assets, but whether such distribution would be in the best interest of the several beneficiaries who would thereby become involved in the several lawsuits is open to question."

On May 1, 1975, the court instructed the trustee to (1) distribute the assets of Trust A, and (2) "[t]he remaining assets which are presently carried in Trust B shall be continued under the administration of the aforementioned Trustee pending the determination of the several lawsuits . . . ."[3]

In October 1993 the successor trustee, Wells Fargo Bank, filed a petition to determine distribution of the Trust B property. The petition stated that the lawsuits had been concluded and the trustee was in a position to distribute the assets. The market value of the assets as of September 24, 1993, was $892,961.66. The trustee requested an instruction to distribute to the five

---

[3]The appellate record does not contain a transcript from the April 21, 1975, hearing on the petition for instructions.

charitable beneficiaries their proportionate share of the entire trust corpus, to the exclusion of the residuary beneficiaries.

Respondent filed objections to the proposed distribution, asserting that the appreciation of Trust B assets since 1974 should accrue to the trust's residue and to the residuary beneficiaries. She claimed the charitable beneficiaries were entitled to only $240,000 plus 4 percent simple interest from November 11, 1975 (one year after James's death and termination of Trust B).

On March 29, 1994, following a hearing on the petition, the court entered its order determining distribution of the Trust B property. The court found, inter alia: (1) Trust B terminated on November 11, 1974, upon James's death; (2) the interests of the charitable and residuary beneficiaries vested upon Corinne's death in 1971 and were confirmed by the 1973 judgment of final distribution of her estate; (3) until distribution of the Trust B assets, the vested interest of the residuary beneficiaries remained contingent only as to its amount; (4) the charitable beneficiaries were entitled to pecuniary gifts totaling $240,000 plus 4 percent interest thereon from November 11, 1975, to January 20, 1994,[4] and all remaining assets were to be distributed to respondent and the four other residuary beneficiaries.

DISCUSSION

I

Appellants contend they have held vested beneficial title to the entire Trust B assets since November 1974 when the trust terminated upon James's death. Respondent rejoins that the beneficiaries' interests vested upon Corinne's death, at which time James's interest became a present interest in possession, appellants became presently vested in a future payment of $240,000, and she and the other residuary beneficiaries, as a class, became presently vested in the residue.

Since the appellate record reveals no conflict in the extrinsic evidence and no issues of credibility, we independently review the testamentary trust, the 1973 judgment of final distribution, and the probate court's 1994 order determining distribution of property. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].)

[4]In 1974 Probate Code section 162 (now Prob. Code, § 12003) provided: "General pecuniary legacies, including general pecuniary legacies in trust, if not paid prior to the first anniversary of the testator's death, bear interest thereafter at the rate of 4 percent per annum."

Pursuant to Probate Code section 15407,[5] "(a) A trust terminates when any of the following occurs: [¶] (1) The term of the trust expires. [¶] (2) The trust purpose is fulfilled. [¶] (3) The trust purpose becomes unlawful. [¶] (4) The trust purpose becomes impossible to fulfill. [¶] (5) The trust is revoked." Upon termination of the trust, the trustee continues to have the powers reasonably necessary to wind up the trust's affairs. (§ 15407, subd. (b).)

Section 15410, subdivision (c) provides, in relevant part, that upon termination of a trust which terminates under its own terms, the trust property shall be distributed "as provided in the trust instrument or in a manner directed by the court that conforms as nearly as possible to the intention of the settlor as expressed in the trust instrument." (See Cal. Law Revision Com. com., Deering's Ann. Prob. Code (1991 ed.) § 15410, p. 231.)

■ "When the objects of a trust have been fully performed the title of the trustee ceases and the legal as well as the equitable title vests in the beneficial owner unless the intention of the creator clearly appears that the legal title should continue in the trustee." (*Ball* v. *Mann* (1948) 88 Cal.App.2d 695, 699 [199 P.2d 706]; accord, *Estate of Newman* (1964) 230 Cal.App.2d 158, 163 [40 Cal.Rptr. 785].) Moreover, "[i]n the absence of any indication to the contrary a testator contemplates prompt distribution." (*Estate of Taylor* (1967) 66 Cal.2d 855, 858 [59 Cal.Rptr. 437, 428 P.2d 301].)

■ In this case Trust B's purpose was to provide James with income during his lifetime, and Corinne's clear and stated intent was that the Trust B assets were to be distributed upon James's death. The parties do not dispute the probate court's finding that Trust B terminated upon James's death on November 11, 1974.

We conclude, as a matter of law, that upon James's death, the trust terminated after having been fully performed, and the beneficiaries' rights vested. At the time of termination the Trust B assets had a value of approximately $178,000 and were insufficient to fully satisfy the $240,000 in specific pecuniary charitable bequests. Consequently, the specific charitable beneficiaries each received a vested beneficial share of the Trust B assets proportionate to their specific bequests. Appellants are correct that because at the time the trust terminated and the beneficial interests vested there was no residue, the residuary beneficiaries' interests were extinguished. That actual physical distribution of the Trust B assets was postponed 20 years does not affect the earlier vesting of title upon the trust's termination. (See *Estate of Newman*, *supra*, 230 Cal.App.2d at pp. 164-165.) Consequently, the court erred in determining that appellants were entitled

---

[5] Unless otherwise indicated, all further statutory references are to the Probate Code.

only to $240,000 plus interest thereon and that respondent and the other residuary beneficiaries were entitled to all remaining Trust B assets.

At first blush it may seem that our decision gives appellants a windfall by entitling them to the nearly $900,000 appreciated value of the bequest. However, in actuality, no such windfall has occurred. Appellants were entitled to the approximately $178,000 bequest in 1974. As a result of the court's May 1975 order, appellants had to forego any bequest from Trust B for 20 years. We can safely say that had the $178,000 sum been wisely invested in 1974, its present value would likely approximate, if not exceed, $900,000.

II[6]

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed, and the matter remanded with directions to distribute the assets to appellants in accordance with the terms of the testamentary trust of Corinne W. Reisinger.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied August 11, 1995.

---

[6]See footnote 1, *ante*, page 1619.