Filed 10/22/24  Sweem v. The Christian Broadcasting Network CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| DEREK SWEEM, | C098016 |
| Plaintiff and Respondent, | (Super. Ct. No. SPR0009452) |
| v. | |
| THE CHRISTIAN BROADCASTING NETWORK, INC., | |
| Defendant and Appellant. | |

This appeal concerns a family trust created by Kenneth F. and Carolyn Reed, both now deceased.  Kenneth and Carolyn were survived by a son, Paul P. Reed, who became the trust's sole trustee and beneficiary.  Paul was killed in an accident just a few months after Carolyn (his last surviving parent), and before title to certain real property held by the trust had been formally transferred to him.

Paul's intestate heirs filed a petition for construction of the trust.  They argued the trust terminated upon Carolyn's death, and Paul succeeded to the trust property at the

1

same time by operation of the doctrine of merger, despite the fact that title to the property had not been formally transferred to him.  (Prob. Code, § 17200, subd. (b)(1), (3), (4), and (6).)[1]  Respondent Derek Sweem joined the petition as personal representative of Paul's estate.[2]

Appellant Christian Broadcasting Network, Inc. (CBN), one of three contingent charitable beneficiaries of the trust, opposed the petition.  CBN argued Carolyn intended an alternate distribution scheme in the event Paul died before "full distribution" of the trust.  The trust was not fully distributed before Paul's death, CBN said, so Paul was not the sole beneficiary, the trust continued to exist, and no merger occurred.  With Paul gone, CBN reasoned, the charitable beneficiaries' interests were no longer contingent, and they were now entitled to the undistributed trust property.

The trial court conducted a bench trial on the merger issue.  Several witnesses testified, including Sweem and three experts.  Following extensive briefing, the trial court issued a statement of decision finding the trust terminated upon Carolyn's death.  Accordingly, the trial court concluded Paul succeeded to the trust's assets, and the interests of the contingent beneficiaries (including CBN) were extinguished.

CBN appeals, arguing: (1) Sweem lacks standing to prosecute the petition; (2) Sweem should be judicially estopped from arguing the trust terminated by operation of the merger doctrine or waived any such argument; (3) the trial court implicitly found CBN was a vested beneficiary in sustaining in part and overruling its demurrer to the petition, but improperly reversed itself in later finding the merger doctrine applied; (4) the trial court improperly admitted expert evidence; and (5) the trial court misinterpreted the trust.  We will reject all of these arguments and affirm.

---

[1] Undesignated statutory references are to the Probate Code.

[2] Sweem is married to one of Paul's intestate heirs.  As we shall see, Sweem also briefly served as successor trustee.

# I. BACKGROUND

## A. *The Trust*

Kenneth and Carolyn, husband and wife, established the trust on May 15, 1995. Kenneth died on October 13, 2003, leaving Carolyn and one surviving son, Paul.[3] Carolyn amended the trust in 2005, making Paul co-trustee. She amended and restated the trust again in June 2013. We are concerned with the amended and restated trust (hereinafter, the Trust), which identifies Carolyn and Paul as co-trustees. We are particularly concerned with Article IV of the Trust, entitled "Distribution on Death of Grantor."

Article IV contains three sections. Section 4.1, entitled "Payment of Expenses and Taxes," provides: "On the death of the Grantor, the Trustee in the Trustee's discretion may pay out of the Trust Estate the just debts, expenses of last illness, funeral expenses, administration expenses and other costs for which the Grantor's estate shall be liable; attorney's fees and other costs incurred in administering the Grantor's estate, whether or not such estate is subject to probate; and any estate inheritance or succession taxes payable by reason of the death of the Grantor whether with respect to any contribution to this Trust or with respect to other assets outside the Trust, including interest and penalties thereon. Any payments for estate or inheritance taxes shall be charged to the Trust Estate without apportionment or charge against any beneficiary of the Trust Estate or any transferee of the property passing outside of the Trust Estate."

Section 4.2, entitled "Distribution of Entire Trust Estate," provides: "After the death of the Grantor and after payment of expenses and taxes as provided hereinabove [in section 4.1], the Trustee shall distribute the entire Trust Estate to PAUL [. . .], free of trust."

---

[3] Another son, Kenneth F. Reed, Jr., predeceased Carolyn and Paul without issue.

Section 4.3, entitled "Alternate Distribution," provides: "If at the time of the Grantor's death, or at any later time before full distribution of the Trust Estate, all beneficiaries of the Grantor are deceased and no other disposition of the Trust Estate is directed by this instrument, the portion of the Trust Estate then remaining shall thereupon be distributed to" three charitable beneficiaries, including CBN, in equal shares. This case turns on the interpretation and interaction of sections 4.1, 4.2, and 4.3.

B. *Carolyn Dies, Paul Assumes the Role of Sole Trustee, and Soon Dies Himself*

Carolyn died on March 17, 2018. At the time of Carolyn's death, the trust estate included: (1) Ameriprise investment accounts worth approximately $1,000,000; (2) a Wells Fargo account containing approximately $250,000; (3) residential real property in Auburn, California; and (4) an unimproved five-acre parcel in Utah. We are primarily concerned with the Auburn and Utah properties.

Following Carolyn's death, Paul conducted himself as sole trustee and beneficiary of the Trust. He transferred the money in the Ameriprise accounts into another account in his own name, and identified a person to whom the funds would be distributed upon his death. He used some of the money in the Wells Fargo account to pay personal obligations and began to remodel the Auburn property. However, he does not appear to have transferred title to the Auburn or Utah properties to himself. Instead, title to both properties remained in the Trust.

Paul was killed in a motorcycle accident on July 29, 2018, some five months after Carolyn's death.

4

C.     *Sweem Becomes Personal Representative of Paul's Estate and Successor Trustee of the Trust*

Sweem became the administrator and personal representative of Paul's estate on October 10, 2018.[4]  He filed a petition for appointment of a successor trustee on October 19, 2018 (the appointment petition).  (§ 15660, subd. (d).)  The trial court granted the appointment petition on January 17, 2019 (appointment order).

CBN filed a motion to set aside the appointment order on March 19, 2019.  Sweem filed a response, expressing an intent to remain neutral between the charitable beneficiaries, on the one hand, and intestate heirs, on the other.  Sweem's response also sought guidance as to ongoing trust activities, his duties as successor trustee, and reimbursement for certain expenses.

On May 6, 2019, the trial court entered an order vacating the appointment order, and appointing Sweem as a temporary successor trustee pending further proceedings.

D.     *The Second Amended Petition and Demurrer*

The intestate heirs filed the operative second amended petition in November 2019.  (§ 17200, subd. (b)(1), (3), (4), and (6).)  As relevant here, the second amended petition argues the Trust terminated by operation of the doctrine of merger, and therefore, the trust estate should be distributed to the intestate heirs.  The second amended petition also argues the phrase "all beneficiaries of the Grantor," as used in section 4.3 of the Trust, was ambiguous and called for consideration of extrinsic evidence.

CBN demurred to the second amended petition.  Among other things, CBN argued the intestate heirs lacked standing to bring the second amended petition as they were neither beneficiaries nor trustee of the Trust, and there was a misjoinder of parties inasmuch as Sweem (who was still temporary successor trustee) was an indispensable party who had not been joined.  CBN also argued the second amended petition was

---

[4] Sweem is married to Sharon Sweem.  Sharon is Paul's cousin, and one of his intestate heirs.

barred by judicial estoppel, and the merger doctrine was inapplicable. The intestate heirs opposed the demurrer.

*E.      The Joinder, Assignment, and Demurrer Ruling*

Sweem filed a joinder in the second amended petition on February 7, 2020 (the joinder). The joinder represented that Sweem was joining the second amended petition in his capacity as personal representative of Paul's estate. A hearing was held on the demurrer that same day.[5]

The trial court requested and received supplemental briefing on the joinder. The intestate heirs attached an assignment as an exhibit to their supplemental brief. The assignment was executed by Sweem in his capacity as administrator of Paul's estate on February 20, 2020, and purports to assign "any interest Paul P. Reed had in the [Trust] and any claim or claims Paul P. Reed had against the Trust" to the intestate heirs.

The trial court (Commissioner Jacques) issued a ruling on submitted matters on March 24, 2020. The trial court's ruling began by sustaining the demurrer as to the intestate heirs without leave to amend. The trial court explained: "Petitioners will take, if at all, by virtue of their status as the intestate heirs of Paul F. Reed [*sic*]. If the [s]econd [a]mended [p]etition were successful, then the corpus of the trust would be distributed to the Reed Estate. It is therefore only the estate that has an interest in the petition." The trial court overruled the demurrer as to Sweem, finding the misjoinder had been cured by the recently filed joinder.

The trial court then turned to the appointment petition. The trial court observed: "Mr. Sweem's continued service as temporary successor trustee presents a conflict vis-à-vis his joinder in the [s]econd [a]mended [p]etition." "Moreover," the trial court continued, "given the language of the trust, unless and until the [Trust] is invalidated, the

---

[5] Our record does not include a transcript of the hearing.

court perceives no just cause to prevent the charitable beneficiaries from exercising their power under the terms of the trust to appoint the successor trustee." Accordingly, the trial court denied the appointment petition.

## F.    Bench Trial

The matter was tried before the trial court (Commissioner Holley) over the course of two days in May 2022. Prior to testimony, the trial court heard argument on CBN's motion in limine to preclude Sweem's expert witnesses from offering opinion testimony as to their conclusions of law. The trial court denied the motion in limine, indicating it would entertain objections to the expert testimony on a question-by-question basis. Turning to the order of issues for trial, the parties stipulated, and the trial court agreed, that the question of merger would be decided first.

The trial court then heard testimony from Sweem. Sweem generally testified as described *ante*. He confirmed there were assets titled in the name of the Trust when he became successor trustee, adding that he sold the Auburn and Utah properties for $400,000 and $74,000, respectively. Sweem also testified that he paid Carolyn's final income taxes. There were no funeral expenses or expenses of last illness.

Attorney Guy Gibson testified for Sweem as an expert in estate planning and probate law. Gibson explained he was acquainted with Carolyn's estate planning attorney, Ann Armstrong (now deceased), and had reviewed her files concerning the Trust. Gibson testified without objection that nothing in the Trust indicated Carolyn intended to create a trust with a continuing purpose. Gibson was then asked a series of questions concerning section 4.1 of the Trust.[6] These questions drew a range of objections, which we will discuss in greater detail later in this opinion.

---

[6] As noted, section 4.1 deals with the payment of expenses and taxes.

Gibson concluded by observing that numerous tasks are associated with the administration of a trust following the death of the grantor, "such as obtaining a death certificate, getting a tax identification number, and then actually completing the physical transfer of various assets from the trust to the remainder beneficiary." In Gibson's experience, many such tasks are "mere sundry mechanical problems, which have nothing to do with the vesting or the merger of the interests of the remaindermen."

Attorney Preston Marx testified for Sweem as an expert in trust administration. Marx testified the Trust was prepared by Armstrong. Marx spent several years working for the law firm that purchased Armstrong's practice and administered at least 150 trusts created by her. Marx opined, over a relevance objection, that Armstrong used forms in preparing trust instruments for her clients, and the Trust here followed her standard form. Beginning with section 4.2 of the Trust (which deals with distribution of the Trust estate), Marx testified all or almost all of Armstrong's trust instruments, going back to 2000, provided for distribution "after payment of expenses and taxes as provided hereinabove." Turning to section 4.3 of the Trust (which deals with alternate distribution), Marx similarly testified that all or almost all of Armstrong's trust instruments, also going back to 2000, used the words "or at any later time before full distribution of the Trust Estate" to describe the grantor's alternate distribution scheme. Marx touched briefly on the doctrine of merger but was limited to saying that he was familiar with the doctrine and had encountered trusts effected by merger in practice.

Attorney and certified public accountant Bruce Stephenson testified for Sweem as an expert in estate tax. Stephenson testified that Carolyn was responsible as an individual to report income and pay tax on that income through the date of her death. Stephenson testified without objection that the sole trustee and sole beneficiary would assume responsibility for reporting income and paying taxes following the death of the grantor and application of doctrine of merger.

8

CBN called a single witness, Sweem. CBN's counsel elicited testimony that the appointment petition was denied and CBN was appointed successor trustee. Sweem also testified that he paid Carolyn's income taxes for 2017 and 2018 using money from the Wells Fargo account.

G.      *Statement of Decision and Judgment*

The trial court (Commissioner Holley) issued a statement of decision on November 22, 2022. The statement of decision summarizes Sweem's testimony, noting he "testified in an honest and straightforward manner." The statement of decision also identifies Sweem's expert witnesses, offering overviews of the subjects on which they testified, and describing them as "knowledgeable" and "credible." The statement of decision notes, however, that interpretation of the Trust is a judicial function, and "the court relied only on admissible evidence" in arriving at its decision.

The statement of decision rejects CBN's argument—also raised here—that Sweem advanced inconsistent positions concerning the existence of the Trust in the appointment petition and second amended petition, and thus should be judicially estopped from asserting the Trust terminated by operation of the merger doctrine. Turning to the merits, the trial court found Paul became the sole beneficiary and successor trustee upon Carolyn's death and the doctrine of merger applied, such that the Trust terminated at the same time and the interests of the charitable beneficiaries were extinguished.

The trial court entered judgment in Sweem's favor on January 13, 2023. This appeal timely followed.

## II. DISCUSSION

A.      *Standing*

We begin with the question of standing. (See *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1345 [" 'A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on the merits' "].) As in the trial court, CBN argues Sweem lacks standing to prosecute the second amended petition. Alternatively, or

9

perhaps additionally, CBN argues the joinder was ineffective, and Sweem lost standing by assigning the estate's interest in the Trust to the intestate heirs. These arguments are unavailing.

"Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute." (Code Civ. Proc., § 367.) "A 'real party in interest' is generally defined as 'the person possessing the right sued upon by reason of the substantive law.' " (*Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1172.) Put another way, a real party in interest is the person " 'who has title to the cause of action, i.e., the one who has the right to maintain the cause of action.' " (*Ibid.*)

Section 17200, subdivision (a) confers statutory standing on the beneficiary of a trust to petition the trial court "concerning the internal affairs of the trust or to determine the existence of the trust." Section 24 defines "beneficiary," for trust purposes, as "a person to whom a donative transfer of property is made *or that person's successor in interest.*" (Emphasis added.) Paul would have had standing to prosecute the second amended petition as beneficiary of the Trust (§ 17200, subd. (a)), and Paul's estate has standing as successor in interest to Paul. (See *Dunlap v. Mayer* (2021) 63 Cal.App.5th 419, 424-425 ["persons with a present or future interest in a trust include those persons' successors in interest" and "general rules of survivability apply to proceedings under the Probate Code"].) The trial court thus correctly concluded that Sweem has standing as personal representative to Paul's estate. (Code Civ. Proc., § 377.30 ["A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest, . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest"].)

CBN resists this conclusion, arguing Sweem labored under an impermissible conflict of interest. That may be so, but CBN does not explain how the conflict of interest deprived Sweem of standing. Sweem may have been poorly positioned to

10

represent all beneficiaries as successor trustee, but that does not necessarily mean he lacked or lost standing to prosecute the second amended petition as personal representative to Paul's estate. CBN offers no authority for such a proposition, and we decline to adopt it.

Changing tack, CBN argues the joinder was "ineffective" and "dubious." Here again, CBN's argument is unsupported by relevant legal authority. In the absence of any such authority, CBN argues Sweem only succeeded in joining "legally non-existent claims," since the intestate heirs lacked standing to prosecute the second amended petition in the first place. But Sweem has standing as personal representative of Paul's estate (Code Civ. Proc., § 377.30), and the trial court has broad discretion to grant or deny permissive joinder pursuant to Code of Civil Procedure section 378 or compulsory joinder pursuant to Code of Civil Procedure section 389. (See *Petersen v. Bank of America Corp.* (2014) 232 Cal.App.4th 238, 248 [the permissive joinder statute is liberally construed in favor of joinder]; *Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 461 [" 'Whether a party is necessary and/or indispensable [under Code Civ. Proc., § 389] is a matter of trial court discretion in which the court weighs "factors of practical realities and other considerations" ' "].) CBN does not argue the trial court abused its discretion in allowing the joinder, and we decline to so hold.

CBN next argues the assignment divested Sweem of standing. We are not so sure. Sweem might have lost standing had the assignment been made before the joinder in the second amended petition. (See, e.g., *Purcell v. Colonial Ins. Co.* (1971) 20 Cal.App.3d 807, 814 [assignee became real party in interest by reason of assignment].) But a different rule applies when an assignment takes place after an action has been filed. In that circumstance, Code of Civil Procedure section 368.5 vests the trial court with discretion to allow the litigation to continue in the name of the assignor or substitute the

11

assignee.[7]  (See *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 133 [ "trial courts have discretion to allow litigation to continue in the name of the original plaintiff rather than substitute the transferee"].)  CBN does not argue the trial court abused its discretion in allowing the litigation to continue in Sweem's name, and we again decline to so hold.

B.        *Judicial Estoppel and Waiver*

CBN next offers a pair of arguments based on alleged inconsistencies in positions taken by Sweem in the appointment petition and second amended petition.  Specifically, CBN argues Sweem "inherently represented that the Trust existed and was valid and controlling" in seeking appointment as successor trustee in the appointment petition, and inconsistently argued the Trust terminated by operation of law upon Carolyn's death in the second amended petition.  CBN argues Sweem should be judicially estopped from advancing such allegedly contradictory positions.  Alternatively, CBN argues the appointment petition amounted to a waiver of the merger argument in the second amended petition.  The trial court saw nothing to warrant application of the doctrines of judicial estoppel or waiver, and neither do we.

" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.  The doctrine serves a clear purpose: to protect the integrity of the judicial process.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.)  The doctrine applies when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the

---

[7] Code of Civil Procedure section 368.5 provides:  "An action or proceeding does not abate by the transfer of an interest in the action or proceeding or by any other transfer of an interest.  The action or proceeding *may be continued in the name of the original party,* or the court may allow the person to whom the transfer is made to be substituted in the action or proceeding."  (Emphasis added.)

12

first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Id.* at p. 183.)

We independently review whether the elements of judicial estoppel are met on the record evidence. (*Filtzer v. Ernst* (2022) 79 Cal.App.5th 579, 583.) That said, "judicial estoppel *is an equitable* doctrine, and its application, even where all necessary elements are present, is discretionary." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422; see *Filtzer v. Ernst, supra,* at p. 583 [" 'If the elements for judicial estoppel are present, whether to apply the doctrine is within the trial court's discretion, which we review for abuse of discretion' "].) Because the doctrine can produce harsh consequences, it must be "applied with caution and limited to egregious circumstances" (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 170); for example, " ' "when a party's inconsistent behavior will otherwise result in a miscarriage of justice." ' " (*Daar & Newman v. VRL International* (2005) 129 Cal.App.4th 482, 491.)

We are not convinced the elements of judicial estoppel have been met here, as we cannot say Sweem's positions were "totally inconsistent." (*Jackson v. County of Los Angeles, supra,* 60 Cal.App.4th at p. 183.) The appointment petition clearly alleges Paul was the sole beneficiary of the Trust and Sweem intended to marshal trust assets into Paul's estate and distribute them to the intestate heirs. Although the appointment petition does not specifically say the Trust was terminated by operation of the merger doctrine, Sweem's allegations were consistent with that idea, as were his proposed acts as successor trustee. As the trial court observed, the Probate Code contemplates that trustees may retain power after the termination date to perform such acts as are necessary to the winding up of the trust and the distribution of the trust property. (§ 15407, subd. (b) ["On termination of the trust, the trustee continues to have the powers reasonably necessary under the circumstances to wind up the affairs of the trust"]; see also Rest.3d Trusts, § 89 ["The powers of a trustee do not end on the trust's termination date but may

13

be exercised as appropriate to the performance of the trustee's duties in winding up administration, including making distribution, in a manner consistent with the purposes of the trust and the interests of the beneficiaries"].) That trustees may retain power after the termination date means Sweem could logically propose to perform winding up duties as successor trustee without necessarily denying the earlier existence of the Trust. There was no necessary inconsistency between Sweem's position that he should be appointed successor trustee in the appointment petition and the intestate heirs' position in the second amended petition (in which Sweem joined) that the Trust terminated by operation of law upon Carolyn's death. And even assuming such an inconsistency could be said to exist, the trial court could reasonably conclude any change in positions was neither egregious nor likely to result in a miscarriage of justice. (*Jogani v. Jogani, supra,* 141 Cal.App.4th at p. 170; *Daar & Newman v. VRL International, supra,* 129 Cal.App.4th at p. 491.) Consequently, we cannot say the trial court abused its discretion in declining to apply the doctrine of judicial estoppel.

CBN's waiver argument fails for similar reasons. " 'California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33-34.) "The waiver may be either express, based on the word of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Id.* at p. 31.)

The appointment petition does not express an intention to relinquish the merger argument. To the contrary, the appointment petition effectively articulates a merger theory, albeit through different terminology. Apart from repeating the argument rejected above (that the appointment petition contradicts the second amended petition), CBN does not explain how any intention to waive the merger argument could be implied from Sweem's conduct. We therefore reject CBN's waiver argument as well.

14

*C.      The Trial Court Did Not Reverse Itself*

CBN next argues the trial court's judgment violated the principle that one trial judge (or here, commissioner) cannot overturn the order of another trial judge (or commissioner). Specifically, CBN argues Commissioner Jacques "implicitly found" the charitable beneficiaries "were the beneficiaries under the Trust" and "entitled to the remaining assets" in the demurrer ruling, and Commissioner Holley "effectively reversed those findings" in determining the merger doctrine applied in the statement of decision and judgment. We are not persuaded.

"Generally, one trial court judge may not reconsider and overrule an interim ruling of another trial judge." (*In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1248.) "For one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court." (*In re Alberto* (2002) 102 Cal.App.4th 421, 427.) However, an exception arises "when the facts have changed or when the judge has considered further evidence and law." (*In re Marriage of Oliverez, supra,* at p. 1248.) Here, Commissioner Jacques sustained CBN's demurrer as to the intestate beneficiaries, overruled the demurrer as to Sweem, and found Sweem could no longer serve as successor trustee, but the charitable beneficiaries could nominate their own successor trustee. Commissioner Jacques did not consider whether the terms of the trust instrument contemplated distribution of trust assets to the charitable beneficiaries or Paul's estate and did not decide whether the Trust terminated by operation of the merger doctrine. To the contrary, Commissioner Jacques expressly left open the question of termination by operation of law. Commissioner Holley's statement of decision and judgment merely decided issues left open by Commissioner Jacques. There was no violation of the rule prohibiting one trial judge from reconsidering and overruling an earlier ruling by a different trial judge in the same case.

15

D.      *Expert Testimony*

CBN next challenges the admission of expert testimony from Gibson, Marx, and Stephenson.  Relying on *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155 (*Summers*), CBN argues in broadside fashion that all such testimony amounted to improper legal conclusions and should have been excluded.  Sweem responds that CBN has forfeited any challenge to the trial court's evidentiary rulings.  We agree with Sweem.

Where, as here, "a party contends that an evidentiary objection was improperly overruled by the trial court, the party must identify the specific objection, provide legal argument explaining why the trial court's ruling was in error, and support that argument with citation to pertinent legal authority."  (*City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 463, citing *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074.)  Ignoring these requirements, CBN provides a string citation to the reporter's transcript, with no discussion or analysis of any of the questions posed, objections made, or testimony given on any of those pages.  This blunderbuss approach does not come close to meeting CBN's burden to demonstrate error, let alone reversible error.  (*City of Crescent City v. Reddy, supra,* at p. 464 [" 'In arguing only generalities, plaintiffs' briefs do not contain "argument and citations to authority as to why the trial court's evidentiary rulings were wrong" ' "].)  We would be amply justified in finding this issue forfeited.  (*Ibid.* ["By failing to present legal argument with respect to individual objections, [appellant] forfeited any challenge to the trial court's evidentiary rulings"].)  But even on the merits, CBN loses.

Our own review, which we are neither expected nor required to undertake, reveals that many of CBN's citations refer to relevance objections, rather than legal conclusion objections.  (*City of Crescent City v. Reddy, supra,* 9 Cal.App.5th at p. 464 [" ' "We are not required to search the record to ascertain whether it contains support for [appellant's] contentions" ' "].)  Other citations refer to objections that were sustained.  Another citation points us to an objection to a question that was withdrawn, and another to an

16

admonition by CBN's counsel. When the wheat is separated from the chaff, we are left with a few specific objections to Gibson's testimony, and blanket objections, apparently to all expert testimony. Although we have no obligation to do so, we will briefly describe these objections below, and then explain why none of the trial court's rulings compel reversal.

### 1. Additional Background

As previously discussed, the trial court heard testimony from attorney Gibson, an expert in estate planning and probate law. As relevant here, Sweem's counsel asked Gibson whether section 4.1 of the Trust (which deals with the payment of expenses and taxes) mandates any conduct by the trustee. CBN's counsel objected on the ground the question called for a legal conclusion as to interpretation of the Trust. The trial court asked Sweem's counsel to rephrase, noting the testimony might be helpful to the court.

Sweem's counsel then asked whether, in Gibson's experience, a trust instrument granting discretion to a trustee to do a certain thing would also encompass a grant of discretion to not do that thing. CBN's counsel again objected on legal conclusion and relevance grounds. The trial court overruled the legal conclusion objection, but indicated the relevance objection was "well taken." The trial court then said the relevance objection went to the weight of the evidence, and not its admissibility. Accordingly, the trial court allowed the question, and Gibson explained he views section 4.1 as "a boilerplate provision which [he had] in [his] trusts . . . to give the trustee the discretion of the source of where the trustee pays expenses or the trust or taxes and the other items enumerated in that paragraph. It doesn't require the trustee to do it from that source, it allows them to."

Sweem's counsel then asked Gibson whether he thought Carolyn intended to condition distribution of the trust estate to Paul upon the completion of any action described in section 4.1. CBN objected and the trial court sustained the objection. Changing course, Sweem's counsel asked, if section 4.1 were interpreted as including a

17

condition, whether it would have the effect of granting discretion to Paul as trustee in section 4.1 but penalizing him for exercising that discretion in section 4.2.  CBN objected on the ground that the question called for an interpretation of the Trust, and the trial court overruled the objection on the ground the question was a permissible hypothetical (a ground CBN does not challenge).  Gibson explained he does not believe section 4.1 would be viewed as a condition for distribution, as "tax returns are often filed months after a trust has been terminated and distributed."

   2.     *Analysis*

   CBN argues the trial court erroneously admitted legal conclusion testimony and improperly abdicated its judicial responsibility to interpret the Trust to Sweem's experts.  We review rulings by the trial court on the admissibility of evidence, including those that related to expert testimony, for abuse of discretion.  (*Summers, supra,* 69 Cal.App.4th at p. 1168.)  Even assuming the trial court abused its discretion in allowing the testimony, there was no prejudice.

   An expert witness may provide testimony that speaks to the ultimate factual issue in the case, such as what caused an injury at issue, but cannot provide an opinion as to a legal conclusion, such as whether there was sufficient causation between an alleged breach of duty and resulting injuries.  (See *Summers, supra*, 69 Cal.App.4th at p. 1178.)  A witness testifies to a legal conclusion when he or she addresses the manner in which the law should apply to a particular set of facts and therefore, an expert may not offer testimony in which he or she reaches a conclusion by applying the law to the facts of the case.  (*Id.* at p. 1179.)  To allow such testimony would improperly usurp the trial court's function.  (*Ibid.*)

   Here, the trial court allowed Gibson to testify over objection to two things that could be viewed as legal conclusions.  First, the trial court allowed Gibson to characterize section 4.1 of the Trust as "a boilerplate provision which [he had] used in [his] trusts" to give the trustee discretion as to which source of funds he or she will use to pay taxes and

18

expenses. Second, the trial court allowed Gibson to opine that the actions described in section 4.1 would not be likely to be viewed as conditions, as "tax returns are often filed months after a trust has been terminated and distributed." Neither of these opinions can be said to have shifted the field all that much, even assuming they were legal conclusions.

Characterizing a trust provision as "boilerplate" does not involve an application of the law to the facts in any meaningful sense and is perhaps more reasonably viewed as a comment on the ubiquity of such provisions from an experienced practitioner, a proper subject of expert testimony. (See, e.g., *Huddleston v. Herman & MacLean* (5th Cir. 1981) 640 F.2d 534, 552, affd. in part & revd. in part on other grounds (1983) 459 U.S. 375 [proper to admit expert testimony of a lawyer concerning interpretation of certain boilerplate language in the securities industry].) But even assuming the testimony should have been excluded, nothing suggests the trial court relied upon it. To the contrary, the statement of decision establishes the trial court understood its responsibility to interpret the Trust. CBN makes no serious effort to argue otherwise.

Gibson's opinion that section 4.1 would not be viewed as containing conditions for distribution comes closer to establishing reversible error, but still falls short. As before, nothing in the record suggests the trial court relied on the testimony (which was offered in response to an oblique hypothetical), and we will not assume the trial court abdicated its judicial responsibility in favor of a single identifiable instance of questionable expert testimony, which has not been properly presented on appeal. We reject CBN's claim of evidentiary error.

E.      *Application of Merger Doctrine and Construction of Trust*

We now arrive at the central question presented by this appeal: whether the Trust terminated upon Carolyn's death by operation of the doctrine of merger. The answer to that question hinges on the proper construction of the trust instrument. (See *Weinberger v. Morris* (2010) 188 Cal.App.4th 1016, 1021 (*Weinberger*).)

19

## 1. *Applicable Legal Principles and Standard of Review*

We begin with the merger doctrine, which has been described as follows: "[W]hen the sole trustee of a trust and the sole beneficiary of the trust become one and the same person, the duties of the person, in his or her role as trustee, and the interests of the person, in his or her role as beneficiary, 'merge,' meaning that the trust terminates as a matter of law, and the trust's assets irrevocably vest in the beneficiary." (*Weinberger, supra,* 188 Cal.App.4th at p. 1021; see also *Ammco Ornamental Iron, Inc. v. Wing* (1994) 26 Cal.App.4th 409, 417 ["where the legal title and the entire beneficial interest become united in a single person the trust terminates"]; and see Rest. 2d Trusts, § 99, subd. (5), com. e. ["Where one person has both the legal title to property and the entire beneficial interest, he holds it free of trust"].) To determine whether the merger doctrine applies, we must first determine whether Paul became sole trustee and sole beneficiary of the Trust upon Carolyn's death. (*Weinberger, supra,* at p. 1021.) This is a question of law, which we resolve by construing the trust instrument. (*Ibid.*; see also *Ammco Ornamental Iron, Inc. v. Wing, supra,* at p. 418.)

" 'In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker.' [Citation.] 'If the court can ascertain the testator's intent from the words actually used in the instrument, the inquiry ends. [Citation.] " 'Where the terms of [the instrument] are free from ambiguity, the language used must be interpreted according to its ordinary meaning and legal import and the intention of the testator ascertained thereby.' " ' [Citation.] The proper interpretation of a trust instrument is a question of law subject to independent review, ' "unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." ' " (*Zahnleuter v. Mueller* (2023) 88 Cal.App.5th 1294, 1305.) Neither party directs our attention to any conflict or question of credibility in the relevant extrinsic evidence. Accordingly, we independently construe the trust instrument. (*Burch v. George* (1994) 7 Cal.4th 246, 254.)

In so doing, we are " 'not limited to determining what is meant by any particular phrase but may also consider the necessary implication arising from the language as a whole.' " (*Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1074; see also § 21120 ["The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative"]; and see § 21121 ["All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole.  If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument"].)  In addition, we must " ' " 'consider the circumstances under which the document was made so that the court may be placed in the position of the . . . trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect.' " ' " (*Ammerman v. Callender, supra,* at p. 1074.)

If the language of a trust is ambiguous—that is, if it is reasonably susceptible to more than one interpretation—extrinsic evidence is admissible to determine the trust's meaning.  (§ 21102; see also *Estate of Dodge* (1971) 6 Cal.3d 311, 318 ["we may utilize extrinsic evidence to aid in construing the will if we find that the will is 'ambiguous' or, more precisely, that in the light of both the language of the will and the circumstances under which it was made, the will is reasonably susceptible of more than one interpretation"]; and see *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 74 ["Where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument"].)  Extrinsic evidence is not admissible, however, to give a trust instrument a meaning "to which it is not reasonably susceptible." (*Ike v. Doolittle, supra,* at p. 73; see also *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949 ["The court can . . . consider extrinsic evidence regarding the

circumstances under which the trust was made, in order to interpret the trust instrument, but not to give it a meaning to which it is not reasonably susceptible"].)

>    2.    *Analysis*

CBN argues the doctrine of merger does not apply. CBN acknowledges Paul became sole successor trustee upon Carolyn's death but denies he was sole beneficiary of the Trust. Relying on section 4.3 of the trust instrument, CBN argues Paul was required to survive "full distribution" of the trust estate to become sole beneficiary.[8] As noted, Paul died before the Auburn and Utah properties were transferred out of the Trust. Based on this fact, CBN argues the survival condition was not satisfied, and the charitable beneficiaries' interests vested, entitling them to "the portion of the Trust Estate then remaining" and defeating application of the merger doctrine.

Sweem responds that "full distribution" occurred upon Carolyn's death, when the trust terminated and Paul acquired the right to receive the entire trust estate, "free of trust." Relying on *Estate of Newman* (1964) 230 Cal.App.2d 158 (*Newman*) and *Salvation Army v. Price* (1995) 36 Cal.App.4th 1619 (*Salvation Army*), Sweem argues distribution occurs upon the death of the previous beneficiary and termination of the trust, not at the time of physical delivery of the trust assets. Although the question is close, we agree with Sweem.

To understand why, we begin with *Newman*. There, the trustor, Leo, left a will establishing a testamentary trust for the benefit of his wife, Sophie. (*Newman, supra,* 230 Cal.App.2d at p. 160.) The will provided trust assets were to be distributed to certain remainder beneficiaries upon Sophie's death, including Leo's brother, Moritz. (*Ibid.*)

---

[8] Again, section 4.3 provides, in pertinent part: "If at the time of the Grantor's death, or at any later time before full distribution of the Trust Estate, all beneficiaries of the Grantor are deceased and no other disposition of the Trust Estate is directed by this instrument, the portion of the Trust Estate then remaining shall thereupon be distributed" in equal shares to the three charitable beneficiaries.

The will also provided, if any of the beneficiaries were " 'not living at the time of said distribution,' " the deceased beneficiary's share would be added to the shares of the surviving beneficiaries. (*Id.* at p. 161.)

Sophie died. (*Newman, supra,* 230 Cal.App.2d at p. 161.) Moritz died six months later, before any of trust assets had been physically delivered to him. (*Ibid.*) The trustees filed a petition for instructions to determine whether Moritz's share should pass to his estate or be added to the shares of the surviving beneficiaries. (*Ibid.*) The trial court determined Moritz's share should pass to his estate because Sophie's death " 'terminated the trust by operation of law and fixed the rights of the remaindermen.' " (*Ibid.*) Some of the surviving beneficiaries appealed, arguing " 'the time of said distribution' " meant "the time of the actual physical distribution of the assets." (*Id.* at p. 163.) The trial court rejected this argument, and the Court of Appeal affirmed. (*Id.* at pp. 160, 167.)

The *Newman* court concluded the " 'date of distribution' of the trust estate" was the date of Sophie's death, "and not the date when, all of the sundry mechanical problems involved in the transfer of record title having been accomplished, physical delivery of the trust assets could be accomplished." (*Newman, supra,* 230 Cal.App.2d at p. 164.) To hold otherwise, the court reasoned, would be to subject the remainder beneficiaries' interest to "possible fortuitous and extraneous circumstances beyond the control both of the remainderman and the trustee." (*Id.* at p. 163.) The court elaborated: "Instruments of conveyance must be drawn, executed and recorded, stock certificates must be endorsed, delivered to corporate transfer agents and registrars, and returned, checks must be drawn and receipts prepared. If the death of a remainderman in the midst of this process were to divest his interest, the process might well become incredibly repetitious. While a testator or trustor may legally direct such result, it should not be assumed that he so intended except in the light of the most explicit and positive language; no such language faces us here." (*Id.* at pp. 164-165.)

23

Similar logic carried the day in *Salvation Army*. There, the trustor (Corinne) executed a will creating two testamentary trusts—Trust A and Trust B—for the benefit of her husband (James) for his life. (*Salvation Army, supra,* 36 Cal.App.4th at p. 1621.) Upon James's death, Trust B's assets were to be paid to five charities in amounts totaling $240,000. (*Ibid.*) The residue, if any, was to be paid to Corinne's nephew's children, or their issue (including Kristen). (*Id.* at pp. 1621-1622.)

Corinne died in 1971. (*Salvation Army, supra,* 36 Cal.App.4th at p. 1622.) James died three years later, in 1974. (*Ibid.*) At the time of James's death, Trust B had a value of approximately $179,000, and included an interest in land that was the subject of several lawsuits. (*Ibid.*) The trial court directed the trustee to postpone administration of Trust B pending resolution of the lawsuits. (*Ibid.*)

Eighteen years passed. (*Salvation Army, supra,* 36 Cal.App.4th at p. 1622.) By 1993, the lawsuits had been resolved and Trust B had increased in value to nearly $900,000. (*Ibid.*) The trustee petitioned the trial court for instructions, suggesting the $900,000 be paid to the five charities proportionately. (*Id.* at pp. 1622-1623.) Kristen opposed the petition, arguing the charities were only entitled to $240,000, plus interest from 1975. (*Id.* at p. 1623.) The trial court agreed with Kristen, and the charitable beneficiaries appealed. (*Id.* at pp. 1621, 1623.) The Court of Appeal reversed. (*Id.* at p. 1625.)

The *Salvation Army* court explained: " 'When the objects of a trust have been fully performed the title of the trustee ceases and the legal as well as the equitable title vests in the beneficial owner unless the intention of the creator clearly appears that the legal title should continue in the trustee.' [Citations.] Moreover, '[i]n the absence of any indication to the contrary a testator contemplates prompt distribution.' " (*Salvation Army, supra,* 36 Cal.App.4th at p. 1624.) "In this case," the court continued, "Trust B's purpose was to provide James with income during his lifetime, and Corrine's clear and stated intent was that the Trust B assets were to be distributed upon James' death. The parties

do not dispute the probate court's finding that Trust B terminated upon James's death on November 11, 1974.  [¶]  We conclude, as a matter of law, that upon James' death, the trust terminated after having been fully performed, and the beneficiaries' rights vested.  At the time of termination the Trust B assets had a value of approximately $178,000 and were insufficient to fully satisfy the $240,000 in specific pecuniary charitable bequests.  Consequently, the specific charitable beneficiaries each received a vested beneficial share of the Trust B assets proportionate to their specific bequests.  Appellants are correct that because at the time the trust terminated and the beneficial interests vested there was no residue, the residuary beneficiaries' interests were extinguished.  That actual physical distribution of the Trust B assets was postponed 20 years does not affect the earlier vesting of title upon the trust's termination."  (*Ibid.*)

*Newman* and *Salvation Army* teach that "distribution" ordinarily occurs when the beneficiary's right of possession accrues, rather than when she takes actual physical possession of trust assets.  (*Newman, supra,* 230 Cal.App.2d at pp. 164-165; *Salvation Army, supra,* 36 Cal.App.4th at pp. 1624-1625; see also *Estate of Rankin* (1953) 118 Cal.App.2d 184, 186 [distribution of an estate means final distribution in probate, but it is "long settled practice" that distribution of a trust occurs upon termination of the trust].)  As an experienced trust attorney, Armstrong can be presumed to have intended to use the words "distribute" and "distribution" in this sense.  (§ 21122 ["Technical words [in an instrument] are to be considered as having been used in their technical sense unless . . . the context clearly indicates a contrary intention"]; *Estate of Welsh* (1948) 89 Cal.App.2d 43, 50 [" 'where the will is drawn by a lawyer whose experience and competence are beyond question, the presumption that legal terms embodied in a will are used in their legal sense is all but conclusive' "]; and see *Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 935 ["words in private instruments should ordinarily, in the absence of showing a contrary intent, be accorded the effect given them by statutory or case law"].)  To be sure, Carolyn could have required that Paul survive actual physical distribution of

25

the trust estate. However, any such intention should have been expressed in "the most explicit and positive language." (*Newman, supra,* at p. 165.) It was not.[9]

CBN suggests such language can be found in section 4.3 of the trust instrument. Relying on the words, "or at any later time before full distribution of the Trust Estate," CBN argues Carolyn intended that Paul survive both her death and actual physical distribution of the trust assets to take as sole beneficiary. Had Carolyn only intended that Paul survive her death, CBN says, there would have been no need for her to speak in terms of "any later time before full distribution of the Trust Estate." The point is well taken. Interpreting section 4.3 to require only that Paul survive Carolyn would read the words "at any later time before full distribution of the Trust Estate" out of the trust instrument. We should avoid such interpretations where possible. (§ 21120 ["The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative"].)

At the same time, we have difficulty saying section 4.3 expresses an intention to require that Paul survive actual physical distribution of trust assets in "the most explicit and positive language," or that such an intention "clearly appears" in the trust instrument as a whole. (*Newman, supra,* 230 Cal.App.2d at p. 165; *Salvation Army, supra,* 36 Cal.App.4th at p. 1624.) If anything, the trust instrument is arguably ambiguous as to the meaning "distribute" and "distribution." As used here, the words could either refer to the accrual of the beneficiary's right of possession, or the actual physical delivery of trust assets. Under the circumstances, we could consider Marx's testimony that all of Armstrong's trust instruments, going back to 2000, used the phrase "or at any later time

---

[9] Here, we note the trust instrument was arguably ambiguous as to the meaning of "distribute" and "distribution." On the one hand, the words could refer to the vesting of the beneficiary's interests; on the other, they could refer to physical delivery of trust assets.

26

before full distribution of the Trust Estate" to describe the grantor's alternate distribution scheme. (See *Ike v. Doolittle, supra,* 61 Cal.App.4th at p. 74.) That testimony belies any argument Carolyn specifically intended that Paul survive actual distribution of the trust estate. We need not consider extrinsic evidence, however, as we conclude section 4.2 of the trust instrument, which directs the trustee to distribute "the entire Trust Estate to PAUL [. . .], free of trust," indicates Carolyn intended that distribution take place at the time of termination of the Trust, notwithstanding any "sundry mechanical problems involved in the transfer of record title." (*Newman, supra,* at p. 164.)

*Weinberger,* on which CBN relies, does not compel a contrary conclusion. There, the trustor, Sue, had two children. (*Weinberger, supra,* 188 Cal.App.4th at p. 1018.) The trust instrument named Sue's daughter, Sheila, as successor trustee, followed by Sheila's fiancé, Lee. (*Ibid.*) The trust instrument intentionally omitted Sue's son, Robert. (*Id.* at p. 1019.) The trust instrument provided that, upon Sue's death, the trustee was to pay expenses, and all trust assets were to go to Sheila. (*Ibid.*)

Sue died, but Sheila failed to transfer the trust assets to herself. (*Weinberger, supra,* 188 Cal.App.4th at p. 1019.) Sheila then died, and Robert and Lee disagreed over ownership of the trust assets. (*Ibid.*)

Robert argued for application of the merger doctrine. (*Weinberger, supra,* 188 Cal.App.4th at p. 1021.) He maintained the trust assets irrevocably vested in Sheila when Sue died, giving him an interest as Sheila's sole heir. (*Id.* at p. 1020.) The trial court disagreed, and the Court of Appeal affirmed. (*Id.* at pp. 1018, 1020.)

The court found the merger doctrine inapplicable, noting the trust instrument contemplated ongoing management by the successor trustee and established a contingency plan for delays in distribution of the trust estate. (*Weinberger, supra* 188 Cal.App.4th at p. 1021.) The court explained: "The language employed by [Sue] in her trust instrument provided that, upon her death, the trustee would pay certain expenses and distribute her personal effects in accord with her written directions, and distribute the

remainder to Sheila. If [Sue's] trust instrument ended there, then Robert's argument might prevail [citation], but it did not. [Sue's] trust instrument further provided in article 5.2.A: 'If Sheila . . . should die prior to receiving final distribution, the undistributed principal and income of such beneficiary's share shall be held, administered and distributed for the benefit of Lee [] . . . .' And article 5.4 provided: 'Until a beneficiary receives his or her final distribution, the Trustee may pay to or apply for the benefit of such beneficiary, all or part of the net income plus principal from such beneficiary's share, for the health, support, maintenance, and education of such beneficiary. We see no language in [Sue's] trust instrument indicating that it imposed upon a trustee an affirmative duty to make a prompt distribution of the Trust's assets to Sheila upon [Sue's] death. At the same time, the Trust included express language governing the contingency of Sheila's death prior to a distribution of trust assets to her." (*Id.* at pp. 1021-1022.)

Unlike *Weinberger,* the instant trust instrument does not contemplate ongoing management by the successor trustee. To the contrary, section 4.2 directs the trustee to distribute "the entire Trust Estate to PAUL [. . .], free of trust." The parties appear to agree that "free of trust" means outright, or without restriction. Thus, if section 4.2 applies, Paul acquired an immediate and vested right to the entire trust estate, without triggering section 4.3. The parties disagree, of course, as to whether the "payment of expenses and taxes as provided hereinabove" was a condition precedent to distribution of the trust estate, and if so, whether that condition was satisfied.

CBN argues section 4.2 requires *both* Carolyn's death *and* payment of expenses and taxes before distribution of the trust estate. CBN observes Carolyn predeceased Paul, but Sweem paid Carolyn's final income taxes following Paul's death. Given this timing, CBN argues one of section 4.2's conditions precedent to distribution of the trust estate was not satisfied, and section 4.3's alternate distribution scheme governs.

Sweem counters that section 4.2 incorporates section 4.1, which vests discretion in the trustee concerning the payment of expenses and taxes. From this premise, Sweem

28

reasons that section 4.2 cannot be construed as a condition precedent to distribution of the trust estate, as the trustee could have exercised his discretion not to make payments. Sweem's argument overstates the matter somewhat. True, section 4.2 incorporates section 4.1, which vests the trustee with discretion concerning the payment of expenses and taxes. But that discretion appears to extend only to the source of funds used to make the payments. Neither section 4.1 nor any other provision in the trust instrument authorizes the trustee to refuse to pay "the just debts, expenses of last illness, funeral expenses, administration expenses and other costs for which the Grantor's estate shall be liable." That said, we do not believe payment of Carolyn's income taxes was a condition precedent to distribution of the trust estate.

"A 'condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' [Citations.] Conditions precedent may be created either expressly—by words such as ' "subject to" ' or 'conditioned upon'—or impliedly. [Citations.] They are generally disfavored and are strictly construed against a party arguing the agreement imposes one. [Citation.] Courts will not interpret a provision as a condition precedent absent clear, unambiguous language requiring that construction." (*Estate of Jones* (2022) 82 Cal.App.5th 948, 953.)

Section 4.2 directs the trustee to distribute the entire trust estate to Paul following Carolyn's death and "after payment of expenses and taxes as provided hereinabove." Section 4.1 authorizes the trustee to use money from the trust estate to pay certain death-related expenses, such as funeral expenses and expenses of last illness. The evidence was undisputed that there were no such expenses. Section 4.1 also authorizes the trustee to use money from the trust estate to pay "any estate, inheritance or succession taxes payable by reason of the death of the Grantor." Section 4.1 does not say anything about Carolyn's income taxes, and we do not believe Article IV's generic references to "taxes" can be reasonably viewed as unambiguously requiring payment of Carolyn's income

29

taxes.  (*Estate of Jones, supra,* 82 Cal.App.5th at p. 953; see also *Oakland Bank of Commerce v. Washington* (1970) 6 Cal.App.3d 793, 800 ["Of course, as between the mere heading and the specific provision, if there be any conflict, an interpretation made only from a reading of the document would be in favor of the specific provision"].)  We therefore conclude any conditions precedent to distribution of the trust estate to Paul were satisfied, and he acquired an indefeasible right to receive the entire estate "free of trust" upon Carolyn's death.  It follows that Paul's heirs are now entitled to the Auburn and Utah properties.

## III.  DISPOSITION

The judgment is affirmed.  Respondent shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

RENNER, J.



We concur:


/S/

EARL, P. J.


/S/

ROBIE, J.


30